# IN THE SUPREME COURT OF MISSISSIPPI
## NO. 95-DP-00144-SCT

*PAUL EVERETTE WOODWARD*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 09/20/95 |
| TRIAL JUDGE: | HON. RICHARD WAYNE McKENZIE |
| COURT FROM WHICH APPEALED: | PERRY COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | MICHAEL ADELMAN |
| | TERRYL RUSHING |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: MARVIN L. WHITE |
| DISTRICT ATTORNEY: | HERBERT H. KLEIN, III |
| NATURE OF THE CASE: | CRIMINAL - DEATH PENALTY (DIRECT APPEAL) |
| DISPOSITION: | AFFIRMED - 12/18/97 |
| MOTION FOR REHEARING FILED: | 1/2/98 |
| MANDATE ISSUED: | 11/30/98 |

**EN BANC.**

**PRATHER, PRESIDING JUSTICE, FOR THE COURT:**

## I. <u>INTRODUCTION</u>

¶1. This capital murder case arises from the July 23, 1986, rape and murder of twenty-four-year-old Rhonda Holliman Crane (a volunteer, court-appointed, special advocate for children in the Jackson County Youth Court). Crane was traveling alone on Highway 29 in Perry County to meet her parents, who were camping at Flynt Creek Water Park. The appellant, Paul Everette Woodward, who was driving a logging truck, forced her vehicle to stop. He ordered her into his truck at gunpoint, and drove her to a secluded spot. He took her into the woods, raped her, and shot her in the back of the head, killing her instantly. Crane's father found her body the next day.

¶2. This Court affirmed Woodward's subsequent capital murder conviction and death sentence. Thereafter, however, this Court granted Woodward's petition for post-conviction relief, based upon the United States Supreme Court's decision in *Clemons v. Mississippi*, 494 U.S. 738 (1990). The

case was remanded for resentencing, and Woodward was, once again, sentenced to death. The appeal *sub judice* arises from Woodward's second sentencing trial.

¶3. Several of the issues raised by Woodward on appeal were not presented to the trial judge for consideration; therefore, consideration of these issues is procedurally barred. In addition, after due consideration, this Court finds each issue raised by Woodward to be without merit. Accordingly, the judgment sentencing Woodward to death is affirmed.

## II. <u>STATEMENT OF THE CASE</u>

¶4. On September 8, 1986, Paul Everette Woodward was indicted by the Perry County Grand Jury for the July 23, 1986, capital murder (with the underlying crime of rape), kidnapping, and sexual battery of Rhonda Crane. Upon Woodward's motion for change of venue, a trial was held in Hinds County in April, 1987. Woodward was convicted on all three counts, and was sentenced to death on the capital murder conviction. On direct appeal, this Court affirmed. *Woodward v. State*, 533 So. 2d 418 (Miss. 1988) (hereinafter *Woodward I*), *cert. denied*, 490 U.S. 1028 (1989), *reh'g denied*, 490 U.S. 1117 (1989).

¶5. On October 7, 1993, this Court granted Woodward's motion for post-conviction relief, and remanded the case for resentencing on the capital murder charge. Specifically, this Court cited the United States Supreme Court decision in *Clemons v. Mississippi*, 494 U.S. 738 (1990), and held that Woodward's death sentence was improper because the sentencing jury was incorrectly instructed regarding the "especially heinous, atrocious, or cruel" aggravating circumstance. *Woodward v. State*, 635 So. 2d 805, 811 (Miss. 1993) (hereinafter *Woodward II*).

¶6. On remand for resentencing on the capital murder charge, the trial judge granted Woodward's motion to withdraw the motion for change of venue. Jury selection in Perry County began September 13, 1995.

¶7. On September 20, 1995, the jury rendered its verdict, that Woodward should, once again, be sentenced to death. Specifically, the jury found that Woodward: a) attempted to kill the victim, b) actually killed the victim, c) intended the killing of the victim, and d) contemplated that lethal force would be employed. The jury also found the following aggravating factors to exist: a) the murder was committed while Woodward was engaged in the commission of rape, b) the murder was especially heinous, atrocious, or cruel, and c) the murder was committed for the purpose of avoiding or preventing a lawful arrest, or effecting an escape from custody. The trial judge then sentenced Woodward to death.

¶8. On September 26, 1995, Woodward moved for a judgment notwithstanding the verdict (JNOV), or, in the alternative, a new trial. The trial judge denied the motion October 12, 1995. From that judgment, Woodward appeals, *in forma pauperis*, and raises the following issues for consideration by this Court:

> **A. WHETHER THE TRIAL COURT ERRED IN DENYING THE APPELLANT'S CHALLENGES TO MISSISSIPPI'S CAPITAL MURDER STATUTES?**
>
> **B. WHETHER THE TRIAL COURT ERRED IN DENYING THE APPELLANT'S**

**REQUEST FOR PSYCHIATRIC EVALUATION?**

**C. WHETHER THE TRIAL COURT ERRED IN ALLOWING THE STATE TO PEREMPTORILY STRIKE EVERY AVAILABLE BLACK JUROR IN VIOLATION OF *BATSON V. KENTUCKY* AND *POWERS V. OHIO*?**

**D. WHETHER THE TRIAL COURT ERRED IN ALLOWING THE INTRODUCTION OF PHOTOGRAPHS OF THE DECEDENT?**

**E. WHETHER THE TRIAL COURT'S LIMITING INSTRUCTION DEFINING "ESPECIALLY HEINOUS, ATROCIOUS, OR CRUEL" BOTH BY ITS DEFINITION OF TERMS AND ITS REFERENCE TO MUTILATION, TORTURE OR DISMEMBERMENT WAS CONSTITUTIONALLY INVALID AND UNSUPPORTED BY THE EVIDENCE IN THIS CASE?**

**F. WHETHER THE STATE ADDUCED EVIDENCE TO SUPPORT THE PROPOSITION THAT THE MURDER WAS COMMITTED FOR THE PURPOSE OF AVOIDING OR PREVENTING DETECTION AND LAWFUL ARREST?**

**G. WHETHER THE SUPREME COURT CAN REWEIGH REMAINING AGGRAVATING CIRCUMSTANCES TO DETERMINE WHETHER THE DEATH SENTENCE WAS PROPER?**

**H. WHETHER THE PAYMENT OF THE STATE'S WITNESSES IN EXCESS OF THE AMOUNT PERMITTED BY LAW CONSTITUTES PROSECUTORIAL MISCONDUCT THAT MANDATES REVERSAL?**

¶9. As stated earlier, consideration of several of these issues is procedurally barred, because the issues were not presented to the trial court. This rule is not diminished in a capital case. *Chase v. State*, 645 So. 2d 829, 845 (Miss.1994); *Foster v. State*, 639 So. 1263, 1270 (Miss.1994); *Cole v. State*, 525 So. 2d 365, 369 (Miss.1987); *Irving v. State*, 498 So. 2d 305, 307 (Miss.1986); *Johnson v. State*, 477 So. 2d 196, 214 (Miss.1985); *In re Hill*, 460 So. 2d 792, 798 (Miss.1984); *Hill v. State*, 432 So. 2d 427, 439 (Miss.1983). Alternatively, this Court has considered the merits of the procedurally barred claims, with the knowledge that any subsequent review will stand on the bar alone. *Chase*, 645 So. 2d at 845; *Foster*, 639 So. 2d at 1270. Additionally, this Court has considered the merits of the remaining claims.

¶10. After thorough consideration, this Court finds that the issues raised by Woodward on appeal lack merit. For this reason, the trial court's imposition of the death sentence is affirmed. Moreover, in cases where the death sentence is affirmed, Mississippi law mandates a determination of the following additional issue:

**I. WHETHER, PURSUANT TO MISS. CODE ANN. § 99-19-105(3), THE DEATH SENTENCE IMPOSED IN THIS CASE WAS FREE FROM THE INFLUENCE OF PASSION, PREJUDICE OR ANY OTHER ARBITRARY FACTOR; SUPPORTED BY THE EVIDENCE; AND PROPORTIONATE TO THE PENALTY IMPOSED IN SIMILAR CASES?**

# III. LEGAL ANALYSIS

¶11. This Court's standard for reviewing an appeal from capital murder conviction and death sentence was explained in *Williamson v. State*, 512 So. 2d 868, 872 (Miss. 1987):

> On appeal to this Court convictions of capital murder and sentences of death must be subjected to what has been labeled 'heightened scrutiny.' Under this method of review, all bona fide doubts are to be resolved in favor of the accused because 'what may be harmless error in a case with less at stake becomes reversible error when the penalty is death.'

*Balfour v. State*, 598 So. 2d 731, 739 (Miss. 1992) (citations omitted). Woodward raises eight assignments of error for this Court's review under this standard.

## A. WHETHER THE TRIAL COURT ERRED IN DENYING THE APPELLANT'S CHALLENGES TO MISSISSIPPI'S CAPITAL MURDER STATUTES?

¶12. Woodward filed several pre-trial motions challenging the validity of Mississippi's capital murder statutes, all of which were denied. On appeal, Woodward contends that Mississippi's capital murder statutes are unconstitutional because capital punishment is cruel and unusual. He also argues that the imposition of capital punishment is inherently capricious.

¶13. "[T]his Court has previously determined that Mississippi's capital sentencing scheme, as a whole, is constitutional." *Lockett v. State*, 614 So. 2d 888, 897 (Miss. 1992) (citing *Billiot v. State*, 454 So.2d 445 (Miss.1984); *Smith v. State*, 419 So.2d 563 (Miss.1982); *Jones v. State*, 381 So.2d 983 (Miss.1980); *Coleman v. State*, 378 So.2d 640 (Miss.1979)). Therefore, Woodward's argument is without merit.

## B. WHETHER THE TRIAL COURT ERRED IN DENYING THE APPELLANT'S REQUEST FOR PSYCHIATRIC EVALUATION?

¶14. Woodward also moved pre-trial for funds with which to be examined by Dr. John Ritter, a psychiatrist. Dr. Clarence Thurman, the clinical psychologist who had extensively evaluated Woodward in 1986 and 1994, filed an affidavit supporting Woodward's request for evaluation by a forensic psychiatrist. According to Dr. Thurman:

> Given the severity of Mr. Woodward's emotional problems, I believe that his request for examination and assistance by a forensic psychiatrist is reasonably necessary to his defense. Such an examination would complement my own interviews and testing of Mr. Woodward and provide a different perspective regarding his emotional problems. I believe such further examination by a medically licensed psychiatrist would not be cumulative and would contribute substantially and significantly to Mr. Woodward's defense.

¶15. The trial judge granted in part and denied in part Woodward's motion for psychiatric evaluation as follows:

> IT IS, THEREFORE, ORDERED AND ADJUDGED, that the defendant be allowed evaluation at Mississippi State Hospital if he so desires psychiatric examination, and to continue to have at his disposal Dr. Clarence Therman [sic], who has previously examined the defendant,

as well as testified in connection with this matter for the defendant's behalf, and to allow the defendant additional funds to continue any examination and treatment of the defendant by Dr. Clarence Therman [sic], and the portion of the Motion requesting additional psychiatric expertise is overruled.

¶16. Thus, the trial judge granted Woodward the opportunity for psychiatric evaluation at Whitfield State Hospital, but denied him the opportunity to be examined by his psychiatrist of choice. Woodward argues that the opportunity to be examined by State psychiatrists was not adequate. He claims that he was prejudiced by being denied access to a medical expert to corroborate and enhance Dr. Thurman's testimony, because such corroboration would have been highly relevant to the mitigation evidence in this case. In support of his argument, Woodward cites *Ake v. Oklahoma*, 470 U.S. 68 (1985).

¶17. In *Ake*, the United States Supreme Court ruled that a trial judge is required "to allow expert psychiatric or psychological assistance to indigent defendants upon a threshold demonstration that sanity will be an issue or for the purpose of rebutting the State's experts regarding mental condition." *Cole v. State*, 666 So. 2d 767, 781 (Miss. 1995) (citing *Ake*, 470 U.S. at 83). In the case *sub judice*, the State did not present expert evidence of Woodward's mental condition in its case-in-chief. However, Woodward presented Dr. Thurman's expert psychological testimony in mitigation. Therefore, Woodward's mental condition did appear to be "an issue" in the case, such that *Ake* would apply.

¶18. Nonetheless, even the *Ake* Court acknowledged that a criminal defendant is not entitled "to choose a psychiatrist of his personal liking or to receive funds to hire his own." *Ake*, 470 U.S. at 83. Rather, the Court's concern was that "the indigent defendant have access to a competent psychiatrist." *Id.*

¶19. Thus, the question is, whether the order allowing Woodward to be examined at the Whitfield State Hospital met the requirements of *Ake*. This Court has repeatedly held that, where the defendant was evaluated by psychiatrist(s) from the Whitfield State Hospital, the examination "satisfied 'the constitutional mandate of [*Ake v. Oklahoma*].'" *Butler v. State*, 608 So. 2d 314, 321 (Miss. 1992) (quoting *Willie v. State*, 585 So. 2d 660, 671 (Miss. 1991)); *Cole*, 666 So. 2d at 781; *Lanier v. State*, 533 So. 2d 473, 480-81 (Miss. 1988). The analysis is no different in this case, even though Woodward did not avail himself of the examination allowed by the trial court.

¶20. Therefore, the trial judge's decision to allow Woodward to undergo psychiatric evaluation at the Whitfield State Hospital was sufficient. Woodward's argument to the contrary is without merit.

## C. WHETHER THE TRIAL COURT ERRED IN ALLOWING THE STATE TO PEREMPTORILY STRIKE EVERY AVAILABLE BLACK JUROR IN VIOLATION OF *BATSON V. KENTUCKY* AND *POWERS V. OHIO*?

¶21. Woodward also argues that, pursuant to *Batson v. Kentucky*, 476 U.S. 79 (1986), and *Powers v. Ohio*, 499 U. S. 400 (1991), the trial judge erred in granting the State's peremptory challenges to black members of the venire. The record reflects that Woodward is white. The State exercised eleven peremptory challenges to the jury pool, five of which were for blacks. The State exercised one strike for each of the two alternate juror positions; one of the potential alternates challenged by the State

was black. As a result of these challenges, every black person was removed from the jury panel, and the jury that was eventually empaneled was composed entirely of white members.

¶22. According to **Batson** and its progeny, the State cannot exercise its peremptory strikes in a racially discriminatory manner. **Powers**, 499 U. S. at 415-16. A review of **Batson** questions normally involves a three-step analysis:

> The Supreme Court set forth a three[-]step process for determining whether a party has improperly utilized peremptory challenges for the purpose of racially discriminating against potential jurors in violation of the Equal Protection Clause. The party objecting to the peremptory challenge must first make a *prima facie* showing that race was the criteria for the exercise of the peremptory challenge. If this initial showing is successful, the party desiring to exercise the challenge has the burden to offer a race-neutral explanation for striking the potential juror. The trial court must then determine whether the objecting party has met their burden to prove there has been purposeful discrimination in the exercise of the peremptory [challenge].

*Stewart v. State*, 662 So. 2d 552, 557-58 (Miss. 1995).

¶23. Thus, ordinarily, the first step in this analysis would be to determine whether there was a *prima facie* showing that race was the motivation for the State's peremptory challenges. However, in this case, the State has given an explanation for the exercise of its peremptory strikes. Under these circumstances, the sufficiency of the *prima facie* showing of discrimination is moot. **Hernandez v. New York**, 500 U.S. 352, 358 (1991); **Mack v. State**, 650 So. 2d 1289, 1298 (Miss. 1994).

¶24. Therefore, the first prong of the analysis is to determine whether the State met its burden of offering race-neutral reasons for its peremptory challenges of blacks members of the venire. "The establishment of a race[-]neutral reason is not a difficult task." **Stewart**, 662 So. 2d at 558; **Griffin v. State** 607 So. 2d 1197, 1202 (Miss. 1992).

> [A] trial judge's factual findings relative to a prosecutor's use of peremptory challenges on minority persons are to be accorded great deference and will not be reversed unless they appear clearly erroneous or against the overwhelming weight of the evidence. This perspective is wholly consistent with our unflagging support of the trial court as the proper forum for resolution of factual controversies.

**Stewart**, 662 So. 2d at 558 (quoting **Lockett v. State**, 517 So. 2d 1346, 1350 (Miss. 1987)); **Johnson v. Mississippi**, 529 So. 2d 577, 583-84 (Miss. 1988) ("The determination of whether purposeful discrimination has been shown largely turns on credibility . . . a trial judge's factual findings relative to a prosecutor's use of peremptory challenges on minority persons are accorded great deference and will not be reversed unless they appear clearly erroneous or against the overwhelming weight of the evidence.").

¶25. Woodward argues that the State's reasons for challenging black members of the venire were "blatantly pretextual." The State argues that the reasons given were sufficiently race-neutral.

¶26. The record reflects that the trial judge granted the State's peremptory challenges to five black

members of the jury panel. The following is an analysis of the State's reasons for exercising the peremptory strikes, which reasons the trial judge determined were race-neutral:

**1. Juror No. 7 -** The State gave the following reason for challenging Juror No. 7, "she is unemployed and on a previous case was unable to reach a verdict."

"[B]eing unemployed is a race-neutral explanation that can be used to strike a juror." *Mack*, 650 So. 2d at 1298 (citing *Porter v. State*, 616 So. 2d 899, 907 (Miss. 1993)); *Foster v. State*, 639 So. 2d 1263, 1280 (Miss. 1994). In addition, this Court has held that previous service on a jury in a case which resulted in a mistrial is a race-neutral reason for challenging a potential juror. *Harper v. State*, 635 So. 2d 864, 868 (Miss. 1994). Therefore, Woodward's argument with regard to this member of the venire is without merit.

**2. Juror No. 12 -** The following transpired with regard to the State's peremptory challenge of Juror No. 12:

BY [THE ASSISTANT DISTRICT ATTORNEY]: . . . Juror No. 12 . . . was unresponsive. [Co-counsel] both indicated to me that she was very hostile when the State was on *voir dire* and open to the defense. Further that her relative works in Leakesville with the prison system and we struck her on that basis. We didn't want her to have any affiliations with that.

\* \* \*

BY [DEFENSE COUNSEL]: . . . No. 12. He said something about that she was hostile. I remember her as being very cooperative.

BY [THE ASSISTANT DISTRICT ATTORNEY]: That's exactly what we're saying, she was cooperative with you.

BY [DEFENSE COUNSEL]: No, she was cooperative with everybody. I don't remember her being hostile.

BY THE COURT: The Court is of the opinion that the strikes were not racially motivated and was not being done to constitute members of a certain race on the jury panel.

Woodward argues that the State did not peremptorily challenge several white members of the venire who had relatives in law enforcement. These relatives included a brother who worked with the Sheriff's Office; a brother-in-law who was a constable, and a part-time police department employee; and, two in-laws in law enforcement.

However, it is clear from the record that the State moved to peremptorily strike both white and black veniremen who had relatives working for prison systems. That is, the State objected to the fact that the potential jurors' relatives worked in prisons -- not that they worked in "law enforcement."

"Employment and factors related thereto have . . . been accepted by various courts as race-neutral reasons for a peremptory challenge." *Walker v. State*, 671 So. 2d 581, 628 (Miss. 1995) (the fact that the potential juror was a member of the Board of Directors for the Capital

Defense Project was a sufficiently race-neutral reason for exercising a peremptory challenge). In addition, the fact that the State exercised a similar challenge to a white juror "adds strength to the prosecutor's reason and shows consistency of action along racially neutral lines." *Johnson*, 529 So. 2d at 585.

Furthermore, the State also challenged this potential juror because she seemed hostile to the prosecution and "open" to the defense. A similar factual situation arose in *Harper v. State*, 635 So. 2d 864, 868 (Miss. 1994), and this Court upheld the reason given by the State as race-neutral. *Harper*, 635 So. 2d at 868 (quoting *Johnson*, 529 So. 2d at 585) ("A prosecutor may sense by a juror's demeanor that he is hostile to being in court and thus fear that the juror might respond negatively to the prosecution simply because the government was responsible for calling him to jury duty.").

Moreover, this Court has held that "[a]n expression of contempt or hostility may reasonably be assumed to spell trouble for the prosecution. Such demeanor is a legitimate reason, related to any case, for a prosecutor to exercise a peremptory challenge." *Lockett v. State*, 517 So. 2d 1346, 1351-52 (Miss. 1987). For these reasons, the trial judge did not abuse his discretion in granting the State's peremptory challenge to this witness.

**3. Juror No. 22 -** There is considerable discussion in the record about Juror No. 22, beginning with her ambiguous testimony during individual *voir dire* regarding her stance on the death penalty. After the individual *voir dire*, the State questioned Juror No. 22's competence. The trial judge noted the inconsistencies in Juror No. 22's answers, and the fact that the juror would not maintain eye contact. However, he decided to return her to the jury pool.

Thereafter, the State's request to remove this potential juror from the venire for cause was denied. The trial judge stated, "She was incoherent at times I thought, and her body language was such that she did appear nervous. She did not maintain eye contact with anyone. But I don't know that she reached the level of incompetence." The judge then asked if the State wanted further individual *voir dire* of Juror No. 22, and the State declined.

Later, the trial judge granted the State's peremptory challenge to this potential juror. The trial judge ruled that the peremptory strike was not racially motivated. The record clearly indicates that the State struck this member of the venire because of doubts concerning her competency. The trial judge noted in the record that this potential juror would not make eye contact, seemed nervous, and gave conflicting, if not incomprehensible, responses with regard to her opinion of capital punishment. Lack of eye contact and demeanor have been approved as race-neutral reasons for peremptorily challenging black members of the venire. *Lockett*, 517 So. 2d at 1351-52. This is particularly true in this case, where the judge described the potential juror's demeanor as "appear[ing] incoherent." Therefore, the trial judge properly ruled that the State's peremptory challenge to this potential juror was not racially motivated.

**4. Juror No. 56 -** The State gave the following reason for peremptorily challenging Juror No. 56:

"BY [THE ASSISTANT DISTRICT ATTORNEY]: Yes. We talked to Jerry Gardner. She is related to another potential juror, No. 67, on the panel, but her husband has had law

enforcement problems at a trailer park, according to Jerry Gardner. And we struck her on that basis. We thought there might be some empathy with that particular case. She lives in the Sand Ridge Trailer Park here in New Augusta.

Woodward argues that a white juror served on the jury, even though he was related to a member of the jury panel. However, the record clearly indicates that the State had another reason for peremptorily challenging Juror No. 56. That is, her husband had "law enforcement problems", and this might make her more empathetic to Woodward. This is a race-neutral reason, and the State's peremptory challenge was properly granted. *See Collins v. State*, 691 So. 2d 918, 927 (Miss. 1997) (citing *Griffin*, 607 So. 2d at 1203 and *Benson v. State*, 551 So. 2d 188 (Miss. 1989)) (striking minority venireman because relative was convicted or was tried for crime is a race-neutral reason).

**5. Juror No. 67 -** During *voir dire*, Juror No. 67 indicated that she was a psychology major in college and that she had two courses in psychology. She had not really used her major, and she was not familiar with psychological testing. She had done "some" reading on the subject of psychology since college.

The State gave the following reason for peremptorily challenging Juror No. 67: "Psychological [sic] major, Your Honor. We struck the same one on S-7, juror No. 37, for the same reason, we don't want a psychology person. And we don't have a written response from her as well."

Woodward argues that a white juror was allowed to serve, despite the fact that he did not turn in a questionnaire. However, the record clearly demonstrates that the State was also concerned about Juror No. 67's psychological training. In fact, the State exercised a peremptory challenge on a white member of the venire with similar training. As stated earlier, this "adds strength to the prosecutor's reason and shows consistency of action along racially neutral lines." *See Johnson*, 529 So. 2d at 585.

Although this Court has not addressed this particular reason for exercising a peremptory challenge to a black venireman, one of our neighboring states has considered this issue in an extremely factually similar case. In *Ex parte Brown*, 686 So. 2d 409 (Ala. 1996), the Alabama Supreme Court considered this question in the context of a capital murder conviction and sentence of death. The prosecutor moved to strike a black member of the jury pool, who had studied psychology in college. The State also moved to strike a white member of the venire, whose spouse was a psychologist. The defendant's mental condition was a substantial issue at trial. The Alabama Court found that the reason for striking the black psychology major was a race-neutral reason. *Brown*, 686 So. 2d at 418. *See also Adanandus v. Johnson*, 947 F. Supp. 1021, 1072 (W.D. Tex. 1996) (potential juror's training in psychology was one of several race-neutral reasons for striking her); *People v. Thomas*, 641 N.E. 2d 867, 873 (Ill. App. Ct. 1994) (psychology student was excused for racially neutral reason). This Court finds the reasoning of the Alabama Court to be persuasive, and holds that the fact that this potential juror had majored in psychology was a sufficiently race-neutral reason for the State's peremptory challenge.

After these peremptory challenges were exercised, the State successfully challenged one black alternate juror (Juror No. 72). The trial judge did not issue a specific ruling with regard to the reason given by the State for challenging this potential alternate juror.

**6. Juror No. 72 -** Juror No. 72 gave the following response during the State's *voir dire*:

BY [THE ASSISTANT DISTRICT ATTORNEY]: . . . Is there anyone here that feels that a victim of rape somehow did something to lure a man to do this? Enticed a man or attracted a man to her to cause him to do this? Anybody have those feelings at all?

Yes, Sir.

NO. 72 . . . : Will you ask that question again?

Do you feel that a rape victim had to lure a man to commit this crime or she enticed the man to commit the crime or somehow attracted him to her to have him commit this crime?

A. You say she had to?

Yes. Do you feel that way?

A. No.

The following transpired with regard to the State's peremptory challenge to this person's service as an alternate juror:

BY [THE ASSISTANT DISTRICT ATTORNEY]: We are going to strike him based on the response to the rape question as well as the fact that his brother-in-law is a convicted felon.

BY THE COURT: So that brings up [the next person] ---

BY [DEFENSE COUNSEL]: For the record, we want to note that [Juror No. 72] is black. They have now struck every black juror.

Striking minority members of the jury pool who are related to a person who has been convicted or tried for a crime is a race-neutral reason. *See Collins*, 691 So. 2d at 927; *Griffin*, 607 So. 2d at 1203; *Benson*, 551 So. at 192. *See also Lockett*, 517 So. 2d at 1351 ("The juror whose brother was convicted of armed robbery can easily be seen as being potentially prejudiced against the prosecution."). Therefore, the State's reason for striking this potential juror was sufficient.

¶27. Woodward also claims that the trial judge erred by summarily rejecting defense counsel's *Batson* arguments, and cites *Hatten v. State*, 628 So. 2d 294, 298 (Miss. 1993). In *Hatten*, this Court prospectively held it "necessary that trial courts make an on-the-record, factual determination, of the merits of the reasons cited by the State for its use of peremptory challenges against potential jurors." *Hatten*, 628 So. 2d at 298. However, where defense counsel does not rebut the race-neutral reasons offered by the State, "the trial judge may base his decision only on the reasons given by the State." *Coleman v. State*, 697 So. 2d 777, 786 (Miss. 1997) (citing *Bush v. State*, 585 So. 2d 1262, 1268 (Miss. 1991)). *See also Sudduth v. State*, 562 So. 2d 67, 71 (Miss. 1990) ("In the absence of an actual proffer of evidence by the defendant to rebut the State's neutral explanations, this Court may not reverse on this point.")

¶28. The record reflects that the trial judge participated attentively in the discourse regarding these potential jurors. Furthermore, with the exception of the challenge to the potential alternate juror, the trial judge specifically found that the State's peremptory challenges were not used in a racially discriminatory manner.

¶29. In addition, the defense did not rebut most of the reasons submitted by the State. The defense did argue that Juror No. 12 had not been hostile as the State claimed; however, the defense did not rebut the State's other reason for striking this potential juror (that she was related to a prison employee).

¶30. The defense also argued, with regard to Juror No. 7, that "the fact that she was unable to reach a verdict in some prior jury is not a racially neutral reason. It's a non-race and it's an irrelevant reason." As stated earlier, the fact that a member of the venire has previously served on a case resulting in a mistrial is a valid, race-neutral reason for exercising a peremptory challenge. Furthermore, this legal argument by defense counsel did not address the other reason offered by the State against this potential juror (that she was unemployed).

¶31. Other than offering these rebuttal statements, the defense repeatedly "noted for the record" that the challenges by the State were for blacks, but did not rebut the reasons given by the State for exercising the strikes. In addition, the trial judge was very attentive to both parties with regard to the exercise of the peremptory challenges. However, the trial judge did not make extensive findings of fact regarding the reasons given by the State (except for his findings regarding the "incoherent" demeanor of Juror No. 22). Rather, the judge ruled that the reasons were race-neutral and that the State's peremptory strikes were not used for the purpose of excluding blacks from the jury.

¶32. Given that defense counsel did not rebut all the reasons offered by the State for striking any one potential juror, and, given, that all of the reasons offered by the State were race-neutral, the trial judge did not err in basing his ruling only on the reasons offered by the State. *See Coleman*, 697 So. 2d 786; *Bush*, 585 So. 2d at 1268; *Sudduth*, 562 So. 2d at 71.

¶33. The only peremptory challenge on which the trial judge made no finding was that of potential alternate Juror No. 72. However, the defense did not challenge the State's reason for striking this juror. Rather, defense counsel stated, "For the record, we want to note that [Juror No. 72] is black. [The State has] now struck every black juror." From this statement, it is not clear that defense counsel wanted to do anything more than make a note for the record; therefore, it is not clear whether the trial judge was being asked to make a ruling.

¶34. Moreover, the fact that the trial judge did not give an explicit ruling on this potential alternate juror did not prejudice Woodward in any way. That is, none of the alternate jurors were asked to sit on the actual panel, so the State's peremptory strike of this potential alternate juror did not affect the outcome of the case. For these reasons, Woodward's assignments of error with regard to *Batson* are without merit.

## D. WHETHER THE TRIAL COURT ERRED IN ALLOWING THE INTRODUCTION OF PHOTOGRAPHS OF THE DECEDENT?

¶35. Woodward next argues that the trial judge erred by admitting two photographs of the deceased

victim. The record reflects that two photographs of the victim's body were introduced over Woodward's objection. These photographs were initially introduced during the testimony of the victim's father, who was the first person to arrive at the scene of the murder. The pictures were used again during the testimony of the officer who arrived at the scene a few moments after the victim's father.

¶36. Woodward contends that these pictures were gruesome and prejudicial and without probative value (since *corpus delicti*, cause of death, location and or identity of the victim were not at issue). In support of his argument, Woodward cites *Sudduth v. State*, 562 So. 2d 67 (Miss. 1990), in which this Court noted that "photographs of the victim should not ordinarily be admitted into evidence where the killing is not contradicted or denied, and the *corpus delicti* and the identity of the deceased have been established." *Sudduth*, 562 So. 2d at 70.

¶37. However, the very next sentence in the *Sudduth* opinion states the general rule with regard to the admission of this type photograph: "Photographs of bodies may nevertheless be admitted into evidence in criminal cases where they have probative value and where they are not so gruesome or used in such a way as to be overly prejudicial or inflammatory." *Sudduth*, 562 So. 2d at 70; *See Brown v. State*, 690 So. 2d 276, 289 (Miss. 1996); *Alexander v. State*, 610 So. 2d 320, 338 (Miss. 1992).

¶38. Furthermore, the standard for reviewing the admission of photographs is whether the admission was an abuse of the trial judge's discretion:

> The admissibility of photographs rests within the sound discretion of the trial court. *Jackson v. State*, 672 So.2d 468, 485 (Miss.1996); *Griffin v. State*, 557 So.2d 542, 549 (Miss.1990); *Mackbee v. State*, 575 So.2d 16, 31 (Miss.1990); *Boyd v. State*, 523 So.2d 1037, 1039 (Miss.1988). Moreover, the decision of the trial judge will be upheld unless there has been an abuse of discretion.

*Brown*, 690 So. 2d at 289; *Holly v. State*, 671 So. 2d 32, 41 (Miss. 1996); *Chase*, 645 So. 2d at 848-49.

¶39. This standard is very difficult to meet. In fact, the "'discretion of the trial judge runs toward almost unlimited admissibility regardless of the gruesomeness, repetitiveness, and the extenuation of probative value.'" *Brown*, 690 So. 2d at 289; *Holly*, 671 so. 2d at 41. "At this point in the development of our case law, no meaningful limits exist in the so-called balance of probative/prejudicial effect of photographs test." *Chase*, 645 So. 2d at 849 (quoting *Williams v. State*, 544 So. 2d 782, 785 (Miss. 1987)).

¶40. Furthermore, this Court has found photographs to be "so gruesome and inflammatory as to be prejudicial in only one circumstance, a close-up photograph of a partly decomposed, maggot-infested skull." *Brown*, 690 So. 2d at 289 (quoting *Taylor v. State*, 672 So. 2d 1246, 1270 (Miss. 1996) (citing *McNeal v. State*, 551 So. 2d 151 (Miss. 1989)); *Holly*, 671 So. 2d at 41. *But see Welch v. State*, 566 So. 2d 680, 685 (Miss. 1990) (where autopsy photographs of dissected victim "were extremely unpleasant and used in such a way as to be overly prejudicial and inflammatory."). Clearly, the pictures in the case at hand do not rise to that level of gruesomeness.[1]

> In *Westbrook v. State*, 658 So.2d 847, 849 (Miss.1995), this Court found that photographs of a victim have evidentiary value when they aid in describing the circumstances of the killing, *Williams v. State*, 354 So.2d 266 (Miss.1978); describe the location of the body and cause of death, *Ashley v. State*, 423 So.2d 1311 (Miss.1982); or supplement or clarify witness testimony, *Hughes v. State*, 401 So.2d 1100 (Miss.1981).

*Brown*, 690 So. 2d at 289; *Holly*, 671 So. 2d at 41.

¶41. In this case, the pictures had evidentiary value with regard to the "heinous, atrocious, or cruel" aggravating factor. *See Jackson v. State*, 684 So. 2d 1213, 1231 (Miss. 1996) (quoting *Shell v. State*, 554 So. 2d 887, 902 (Miss. 1989) (photographs of deceased victim are admissible "during the sentencing phase 'on the issue of whether the crime was heinous, atrocious, or cruel.'")). Furthermore, the photographs supplemented the testimony of the victim's father, who actually found her body. In addition, the pictures supplemented the testimony of Chief Deputy Gardner, who arrived at the crime scene within moments after the victim's body was found. *See Mackbee*, 575 So. 2d at 31-32 (pictures of victims' bodies in trunk of car "supplemented the officers' testimonies concerning what they . . . found at the scene.").

¶42. Given the numerous cases in which the introduction of such photographs has been upheld, the amount of discretion afforded the trial judge in these cases, and the nature of the photographs in the case *sub judice*, this Court holds that the photographs were properly admitted. That is, their probative value outweighed their unpleasantness and/or gruesomeness. Woodward's argument to the contrary is, therefore, without merit.

¶43. Woodward further claims that the pictures were misleading as to the actual cause of death. The testimony of Chief Deputy Jerry Gardner indicated that, due to the apparent bruising and blood on the victim's face, he initially thought that the victim had been hit in the head. He did not know, therefore, that she had been shot in the head, until Woodward confessed to shooting her and the pathologist's report confirmed the cause of death.

¶44. The doctor who performed the autopsy of the victim explained that the blood from the victim's lungs was expelled through her nose after death, and that the apparent bruising on the left side of her face was caused by gravitation of her blood to that area after death. There is no indication that "trick" photography was used. Therefore, the pictures show the image of the deceased victim as it actually appeared to the witnesses who discovered her body, and are not misleading. Woodward's argument to the contrary is wholly without merit.

¶45. Woodward also claims that he was prejudiced when these photographs were allowed to remain on the projection screen after the authenticating witness finished testifying. The record reflects that the following occurred at the end of the testimony of the victim's father:

> Q. Where you found her body, was that located in Perry County, Mississippi?
>
> A. Yes, Sir.
>
> BY [THE ASSISTANT DISTRICT ATTORNEY]: We would tender the witness at this time, your Honor.

BY THE COURT: Cross-examination?

BY [DEFENSE COUNSEL]: We have no questions, your Honor.

BY THE COURT: May he be finally excused?

BY [THE ASSISTANT DISTRICT ATTORNEY]: Yes, sir.

BY THE COURT: I thank you. You may be finally excused.

(WITNESS EXCUSED)

BY THE COURT: Who do you call next?

BY [THE ASSISTANT DISTRICT ATTORNEY]: If it please the Court, we would have a motion on the next witness.

BY THE COURT: All right. Ladies and gentlemen of the jury, it will be necessary for the Court to develop certain things outside the presence of your hearing. Let me caution you this case is not yet before you for your deliberation. At this point in time it would be a violation of your sworn duty to attempt to deliberate among yourselves. Under the direction of the bailiff, you may be retired to the jury room.

AT THIS POINT THE JURY WAS EXCUSED TO THE JURY ROOM, AND THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT OUTSIDE THE PRESENCE OF THE JURY:

BY [DEFENSE COUNSEL]: I've got a motion, too.

BY THE COURT: All right.

BY [DEFENSE COUNSEL]: Comes now the defendant, Paul Woodward, and moves for a mistrial based on the fact that the photographs to which we had objected and to which there was to be an agreement of limited use were left on this tele-

BY [THE ASSISTANT DISTRICT ATTORNEY]: I object to the term "of limited use." I don't know of any agreement of limited use.

BY THE COURT: Wait a minute. Let him finish.

BY [DEFENSE COUNSEL]: Let me finish my -- were left on the teleprompter after this witness has been excused for the sole purpose of continuing to inflame and prejudice the jury.

BY [THE ASSISTANT DISTRICT ATTORNEY]: If it please the Court, there has been no agreement of limiting use of photographs. This photograph was left there when I escorted Mr. Holliman off the stand. I could have easily distributed them to the entire jury panel. It was not done. So we had started to proceed with the next witness, to get the jury out of the way before I went up there and got the photographs off. If there was a problem, there should have been an objection raised prior to being left there, but there's been no prejudice because the State can easily distribute all three photographs and let the jury handle each individually. It was not done.

BY THE COURT: The kind of time frame we're talking about also is very short --

BY [THE ASSISTANT DISTRICT ATTORNEY]: Limited, about fifteen seconds at the most while the jury exited the courtroom.

BY THE COURT: All right. You want to be heard further on this?

BY [DEFENSE COUNSEL]: Just that it was -- it was left on there enough so that the jury could parade right in front of it, and there's a big difference between circulating these photographs and leaving them on this teleprompter so that they can be exposed and impressed on their minds and going beyond after this witness had stopped testifying, and we would --

BY [THE ASSISTANT DISTRICT ATTORNEY]: If it please the Court, I can -- with the next witness, I may do it with Mr. Gardner, pass the photographs around individually, let them each take however long they want to take with these photographs. There's no time limitation on how long a juror can look at it. It's in evidence. There is no prejudice on something like this.

BY THE COURT: I'm going to overrule the motion for a mistrial, but I'm going to caution you in the future, Mr. [Assistant District Attorney], don't leave them on there past the time that your witness is testifying.

BY [THE ASSISTANT DISTRICT ATTORNEY]: Yes, sir.

¶46. The use of a projector to enhance the testimony of a witness is within the discretion of the trial court, and is encouraged -- to the extent it aids "the jury in understanding the witness or other evidence." *Jenkins v. State*, 607 So. 2d 1171, 1176 (Miss. 1992). In addition, the use of a projector during closing arguments is within the discretion of the trial judge. *Smith v. State*, 419 So. 2d 563, 567 (Miss. 1982), *overruled on other grounds by Willie v. State*, 585 So. 2d 660 (Miss. 1991)). However, the use of a "slide show" during closing arguments for the sole purpose of inflaming the jury is prohibited. *Id.* The critical question in this case is whether the manner in which the projector was used was inflammatory.

¶47. The trial judge was there when the photograph was left on the projector. He indicated that it was before the jury for only a "very short" time, and he cautioned the prosecution about leaving such a photograph on the projector in the future. Therefore, the trial judge did not abuse his discretion by overruling the defense's motion for a mistrial. The record does not indicate that the projector was used in an inflammatory manner. *See Id.* Thus, the photographs of the deceased victim were properly admitted. Woodward's argument on this point lacks merit.

**E. WHETHER THE TRIAL COURT'S LIMITING INSTRUCTION DEFINING "ESPECIALLY HEINOUS, ATROCIOUS, OR CRUEL" BOTH BY ITS DEFINITION OF TERMS AND ITS REFERENCE TO MUTILATION, TORTURE OR DISMEMBERMENT WAS CONSTITUTIONALLY INVALID AND UNSUPPORTED BY THE EVIDENCE IN THIS CASE?**

¶48. One of the aggravating factors found to exist by the jury was that the capital murder of Rhonda Crane was especially heinous, atrocious, or cruel. Woodward argues that instruction S-3 (the limiting

instruction that defined "especially heinous, atrocious, or cruel") was unconstitutional and unsupported by the evidence. That instruction provided as follows:

> The Court instructs the jury that in considering whether the capital offense was especially heinous, atrocious, or cruel; heinous means extremely wicked or shockingly evil; atrocious means outrageously wicked and vile; and cruel means designed to inflict a high degree of pain with indifference to, or even enjoyment of the suffering of others.

> An especially heinous, atrocious or cruel capital offense is one accompanied by such additional acts as to set the crime apart from the norm of capital murders -- the conscienceless or pitiless crime which is unnecessarily tortuous to the victim. If you find from the evidence beyond a reasonable doubt that the defendant utilized a method of killing which caused serious mutilation, that there was dismenmberment [sic] of the body prior to death, that there was mental torture and aggravation before death, or that a lingering or torturous death was suffered by the victim then you may find this aggravating circumstance.

¶49. The record reflects that Woodward timely objected to the giving of this instruction. The issue was also raised in Woodward's post-trial motion for JNOV, or, in the alternative, a new trial.

¶50. Woodward submits that this instruction did not properly limit the instruction on the "heinous, atrocious, or cruel" aggravator. Indeed, the first sentence of this instruction, standing alone, has been rejected as a proper limiting instruction by the United States Supreme Court. *See Shell v. Mississippi*, 498 U.S. 1 (1990). However, the first and second sentences of instruction S-3 combined have been approved as a proper limiting instruction. *Wilcher v. State*, 697 So. 2d 1087, 1110 (Miss. 1997) (citing *Clemons*, 494 U.S. at 751; *Coleman v. State*, 378 So. 2d 640, 648 (Miss. 1979))

¶51. Moreover, when considering the entire, three-sentence instruction S-3 as a whole, practically identical instructions have been approved as appropriate limiting instructions in other cases. *See e.g. Jackson v. State*, 684 So. 2d 1213, 1236 (Miss. 1996) (approving similar instruction which did not include "dismemberment" clause, and added "that the Defendant inflicted physical or mental pain before death" after the "serious mutilation" clause); *Conner v. State*, 632 So. 2d 1239, 1270 (Miss. 1993) (approving very similar instruction, except final sentence combined "serious mutilation" and "dismemberment of the corpse" in the same clause and inserted the clause "where the Defendant inflicted physical or mental pain before death" before the phrase dealing with "mental torture and aggravation before death") *Davis v. State*, 684 So. 2d 643, 661-62 (Miss. 1996) (approving this exact instruction, with the additional clause "that [the defendant] inflicted physical or mental pain before death" inserted between the phrases "that there was dismemberment of the body prior to death" and "that there was mental torture and aggravation before death"). *See also Pinkney v. State*, 538 So. 2d 329, 357 (Miss. 1988), *vacated by Pinkney v. Mississippi*, 494 U.S. 1075 (1990) (approving language used in first two sentences and noting that "barbarity sufficient to satisfy this aggravating circumstance can be demonstrated by showing that the defendant utilized a method of killing which caused serious mutilation, where there is a dismemberment of the corpse, where the defendant inflicted physical or mental pain before death, or where a lingering or torturous death was suffered by the victim"); *Jenkins v. State*, 607 So. 2d 1171, 1181-82 (Miss. 1992) (approving the language in the first two sentences followed by the language set forth in *Pinkney*, 538 So. 2d at 357).

¶52. Clearly, S-3 is an appropriate limiting instruction, when supported by the evidence. *See*

*Jackson*, 684 So. 2d at 1217-19 (the victims, four children, were stabbed repeatedly); *Williams*, 684 So. 2d at 1183 (victim suffered slashed throat, stabbed heart, and excised privates); *Davis*, 684 So. 2d at 662 (victim was stabbed five times and shot twice, and death was prolonged); *Jenkins*, 607 So. 2d at 1173 (victim's throat was severed).

¶53. However, Woodward argues that the limiting instruction was not supported by the evidence. Specifically, he contends that the final sentence of the instruction (which refers to mutilation, dismemberment, torture, and lingering death) was not supported by the evidence. In support of this argument, Woodward cites the fact that the gunshot wound to the head killed the victim instantly.

¶54. The record indicates that Woodward pulled his logging truck in front of the victim's car in broad daylight. When she stopped, he forced her from her car and into his truck at gunpoint. He drove her approximately 4.5 miles to a secluded location. Woodward, still holding the gun, led the victim away from the truck and into the woods. Approximately 50-100 yards into the woods, they came to a clearing, where the victim was forced to her knees to perform fellatio on Woodward. Woodward then raped her. While the victim was bent over to collect her belongings, Woodward shot her in the back of the head, killing her instantly.

¶55. Woodward then went about his business, and continued to haul wood for the rest of the day. When initially questioned by law enforcement, Woodward claimed that he had not seen anything unusual near the scene of the kidnapping that day. Woodward also reported to work, as usual, the next day.

¶56. Meanwhile the victim's body had begun to decompose in the July heat, and was infested with maggots when her father found her the day after the murder. She had blood on her face and the left side of her face appeared to be bruised. The doctor who performed the autopsy testified that the blood was expelled from the lungs after death, and the bruising was a result of gravitation of blood after death.[2]

¶57. Clearly, the abduction and rape of the victim prior to her death are evidence that the murder was heinous, atrocious, and cruel within the definition of the first two sentences of instruction S-3. Moreover, the fact that Woodward returned to work as if nothing had happened, as well as his demeanor in the videotaped confession given the day after the murder, indicate that the crime was "conscienceless or pitiless".

¶58. The question is, therefore, whether the final sentence of the instruction was supported by the evidence:

> **If you find** from the evidence beyond a reasonable doubt that the defendant utilized a method of killing which caused serious mutilation, that there was dismenmberment [sic] of the body prior to death, that there was mental torture and aggravation before death, **or** that a lingering or torturous death was suffered by the victim then you may find this aggravating circumstance.

(emphasis added).

¶59. The evidence discussed above supports the phrase regarding whether the victim suffered "mental torture or aggravation before death"[3], which phrase is disjoined from the other phrases by the "or"

connector. Therefore, the fact that these other phrases are not supported by evidence does not constitute error. That is, because the instruction used the disjunctive term, "or", the jury was not required to find all of the elements listed. Rather, the jury was only required to find one of the elements (serious mutilation, dismemberment prior to death, mental torture and aggravation before death, **or** lingering or torturous death).

¶60. The United States Supreme Court has held that there is no constitutional violation where "a trial court instructed a jury on two different legal theories, one supported by the evidence, the other not." *Sochor v. Florida*, 504 U.S. 527, 538 (1992) (citing *Griffin v. United States*, 502 U.S. 46 (1991)). The high Court "reasoned that although a jury is unlikely to disregard a theory flawed in law, it is indeed likely to disregard an option simply unsupported by the evidence." *Sochor*, 504 U.S. at 538. This is particularly true, given that the prosecutor admitted to the jury that the phrases regarding serious mutilation and dismemberment were unsupported by the evidence.

¶61. Moreover, this Court has upheld the use of the disjunctive "heinous, atrocious, or cruel" aggravator, even though it, arguably, allows the jury to find one of these factors without unanimity. *See generally Brown v. State*, 690 So. 2d 276, 295-96 (Miss. 1996)*; Williams v. State*, 684 So. 2d 1179, 1193 (Miss. 1996). *See also Conner v. State*, 632 So. 2d 1239, 1273 (Miss. 1993) (affirming death sentence where "scrivener's error" caused jury verdict on *Enmund* factors to appear in the disjunctive).

¶62. In addition, other jurisdictions have adopted this approach in cases where unsupported evidentiary questions appear in the disjunctive form. For example, the California Supreme Court has consistently affirmed death sentences in cases where the jury was instructed on inapplicable aggravating or mitigating factors. *See People v. Williams*, 940 P. 2d 710, 787 (Cal. 1997); *People v. Miranda*, 744 P.2d 1127 (Cal. 1987); *People v. Ghent*, 739 P.2d 1250 (Cal. 1987).

¶63. In addition, the North Carolina Supreme Court recently upheld a death sentence where the limiting instruction appeared in the disjunctive form. *State v. Wilkinson*, 474 S.E. 2d 37 5, 389 (N.C. 1996).

¶64. Furthermore, the Arizona Supreme Court has rendered a long line of decisions holding that the jury is only required to find one of the factors in the "heinous, atrocious, **or** cruel" aggravator. *See State v. Roscoe*, 910 P.2d 635, 651 (Ariz. 1996); *State v. Kiles*, 857 P. 2d 1212, 1224 (Ariz. 1993); *State v. Wallace*, 728 P.2d 232, 236-37 (Ariz. 1986) (citing *State v. Libberton*, 685 P.2d 1284, 1291 (Ariz. 1984); *State v. Clark*, 616 P.2d 888, 896, (Ariz. 1980)); *State v. Watson*, 586 P.2d 1253 (Ariz. 1978); *State v. Ceja*, 612 P.2d 491 (Ariz. 1980); *State v. Knapp*, 562 P.2d 704 (Ariz. 1977); *State v. Richmond*, 560 P.2d 41 (Ariz. 1976).

¶65. The "heinous, atrocious, or cruel" instruction in this case was supported by the evidence. Moreover, the limiting instruction regarding the definition of "heinous, atrocious, or cruel" was sufficient. The wording of the instruction clearly indicated that it was for the jury to determine which, if any, of the factors in the instruction applied (including serious mutilation, dismemberment prior to death, mental torture and aggravation before death, **or** lingering or torturous death). At least one of these factors (that the victim suffered mental torture and aggravation before death) was supported by the evidence, and the factors appeared in the disjunctive. In addition, the prosecutor admitted during closing arguments that some of the factors were not supported by the evidence. For these reasons,

Woodward's argument on this point is without merit.

## F. WHETHER THE STATE ADDUCED EVIDENCE TO SUPPORT THE PROPOSITION THAT THE MURDER WAS COMMITTED FOR THE PURPOSE OF AVOIDING OR PREVENTING DETECTION AND LAWFUL ARREST?

¶66. Woodward also argues that the evidence did not support the portion of instruction S-4, which allowed the jury to consider the following aggravator: "That the capital offense was committed for the purpose of avoiding or preventing a lawful arrest, or effecting an escape from custody." The State correctly argues that Woodward is procedurally barred from raising this issue, because he did not make a contemporaneous objection to instruction S-4. *See Carr v. State*, 655 So. 2d 824, 854 (Miss. 1995).

¶67. Woodward argues that his objection to S-3 (the limiting instruction for the "heinous, atrocious, or cruel" aggravator) was sufficient to preserve an objection to the "avoiding lawful arrest" aggravator. This argument is clearly specious. Woodward did not specifically object to this instruction, and he is, therefore, procedurally barred from raising the issue on appeal. *See Chase v. State*, 645 So. 2d 829, 857 (Miss. 1994) (appellant was precluded from raising issue on appeal, where "there was no objection to the submission of this aggravating circumstance").

¶68. Procedural bar notwithstanding, and, alternatively, there was sufficient evidence in the record to instruct the jury on the "avoiding lawful arrest" aggravator. The standard for reviewing the sufficiency of the evidence to support an "avoiding lawful arrest" instruction is well-settled:

> [i]f there is evidence from which it may be reasonably inferred that a substantial reason for the killing was to conceal the identity of the killer or killings to "cover their tracks" so as to avoid apprehension and eventual arrest by authorities, then it is proper for the court to allow the jury to consider this aggravating circumstance.

> Under this construction the Court properly submits this aggravator to the jury if evidence existed from which the jury could reasonably infer that concealing the killer's identity, or covering the killer's tracks to avoid apprehension and arrest, was a substantial reason for the killing.

> *Carr v. State*, 655 So.2d 824, 853-54 (Miss.1995); *See also Chase v. State*, 645 So.2d 829, 856-58 (Miss.1994); *Hansen v. State*, 592 So.2d 114, 152-53 (Miss 1991), *cert. denied*, *Hansen v. Mississippi*, 504 U.S. 921, 112 S.Ct. 1970, 118 L.Ed.2d 570 (1992); *Lanier v. State*, 533 So.2d 473, 490 (Miss.1988); *Leatherwood v. State*, 435 So.2d at 651, *Tokman*, 435 So.2d at 671.

*Foster v. State*, 687 So. 2d 1124, 1140 (Miss. 1996).

¶69. "Thus, it is this Court's role to inquire into whether there is any credible evidence upon which the jury could find the aggravating circumstance in question." *Carr*, 655 So. 2d at 854. "Each case must be decided on its own peculiar fact situation." *Brown v. State*, 682 So. 2d 340, 355 (Miss. 1996). Basically, Woodward argues that there is no evidence in the record to indicate that he committed the crime to avoid lawful arrest or effect an escape from custody. Woodward cites the

undisputed evidence that he stayed in Perry County the day of the murder and that, upon request, he voluntarily appeared at the Sheriff's Office and gave incriminating statements the next day.

¶70. Woodward neglects to mention the fact that he was stopped by an officer a few hours after the murder and did not confess at that time. Furthermore, after killing Crane, Woodward completed his work for the day -- presumably to avoid suspicion. Later, Woodward allowed his truck to be searched, but did not mention that he had committed the crime. Therefore, Woodward's voluntary statements, after the authorities requested that he come to the Sheriff's Office, were not as forthcoming as Woodward submits.

¶71. Moreover, Woodward led the victim through the woods to a secluded area and left her there. He also threw the murder weapon in a creek. All of these facts could reasonably indicate that Woodward did not want to be arrested for his crimes. *See generally Walker v. State*, 671 So. 2d 581, 611 (Miss. 1995) (where victim was young, unclothed, unarmed, generally cooperative with her attacker, and in a secluded area, it could be reasonably inferred that the appellant was attempting to "avoid lawful arrest" when he killed her and burned her body).

¶72. Perhaps the most convincing evidence that Woodward killed Crane to avoid arrest appears in his videotaped confession. After describing how he forced the victim from the road, ordered her in his truck at gunpoint, drove her to a secluded location, walked away from the road, sexually battered and raped the victim, Woodward stated the following in his videotaped confession:

> I didn't know what to do. I -- I didn't know what was going on. **I knew that I was in trouble already**. And, uh, she bent down to get something and I whirled around, pulled the trigger, and ran. I didn't know if I had hit her, if I had missed her, or what. I got in my truck and I left.
>
> * * *
>
> I was so scared I didn't know what to do, and uh, **I wanted out of this mess as -- the quickest way possible.**

(emphasis added).

¶73. Thus, the evidence was more than sufficient to allow the jury to reasonably infer that Woodward killed Crane to avoid arrest. Therefore, even if Woodward's argument on this issue were not procedurally barred, it is without merit.

## G. WHETHER THE SUPREME COURT CAN REWEIGH REMAINING AGGRAVATING CIRCUMSTANCES TO DETERMINE WHETHER THE DEATH SENTENCE WAS PROPER?

¶74. Woodward further argues that, because two of the aggravating circumstances contained in the jury instructions were not supported by the evidence, the case must be reversed. That is, Woodward contends that this Court cannot reweigh the remaining aggravator against possible mitigators, and, therefore, the case must be reversed and remanded for a second resentencing hearing.

¶75. Woodward's argument is partially correct. There has been great division among the members of the Court on this subject. However, this Court has consistently held for years that, where an

aggravating circumstance is improperly placed before the jury, there will be no reweighing of aggravating and mitigating circumstances at the appellate level. This is true, despite legislative enactments allowing appellate reweighing. ***King v. State***, 656 So. 2d 1168, 1173 (Miss. 1995) (considering 1994 amendments to Miss. Code Ann. § 99-19-105, which specifically allowed for appellate reweighing of aggravators and mitigators). "[T]he right to a jury determination of the penalty of death is a substantial substantive right long held in this [S]tate." ***Id.***

¶76. However, Woodward's argument assumes that the "heinous, atrocious, or cruel" aggravator and/or the "avoiding lawful arrest" aggravator were improperly given. This Court has already determined that the jury was properly instructed on these aggravating circumstances, therefore the issue of reweighing need not be considered.

## H. WHETHER THE PAYMENT OF THE STATE'S WITNESSES IN EXCESS OF THE AMOUNT PERMITTED BY LAW CONSTITUTES PROSECUTORIAL MISCONDUCT THAT MANDATES REVERSAL?

¶77. Woodward contends that he was prejudiced by the payment of excessive witness fees to State's witnesses, including the victim's husband (Curtis Crane) and serologist (Larry Turner). Woodward cites Rule 3.4 (b) of the Mississippi Rules of Professional Conduct, which prohibits an attorney from offering "an inducement to a witness that is prohibited by law". The comment to this rule provides that "it is not improper to pay a witness's expenses or to compensate an expert witness on terms permitted by law. The common law rule in most jurisdictions is that it is improper to pay an occurrence witness any fee for testifying and that it is improper to pay an expert witness a contingent fee."

¶78. Woodward also cites Miss. Code Ann. § 25-7-47, which provides in pertinent part:

> Witnesses in the county, circuit, and chancery courts shall receive one dollar and fifty cents per day and five cents for each mile going to and returning from the courthouse to their homes by the nearest route, and such tolls and ferriages as they may actually be obliged to pay; but mileage, toll, and ferriage shall be charged but once at each term of court, and a charge shall not be made for mileage except that traveled in this state.

Miss. Code Ann. § 25-7-47 (1991).

¶79. With regard to Curtis Crane, the record reflects that the resentencing hearing was originally scheduled to have begun September 19, 1994. However, after *voir dire*, the trial judge declared a mistrial because the jury pool was not large enough to select an impartial jury. On December 6, 1994, the trial judge ordered that Curtis Crane, the victim's husband, be paid $400 ($200 for each of two days of missed work). The order was filed December 8, 1994.

¶80. The trial was then scheduled for January 30, 1995; however, on January 27, 1995, the trial was continued until September 12, 1995. Nonetheless, the trial judge ordered that Curtis Crane be paid for three days of missed work for his scheduled testimony January 30, 1995, through February 1, 1995. The total amount of payment ordered was $452.88, for twenty-four hours work at $18.87 per hour. The order was filed April 6, 1995.

¶81. The actual resentencing hearing *sub judice* began September 13, 1995. Woodward's post-trial motions were timely filed on September 26, 1995, and were denied on October 12, 1995. Thereafter, on November 1, 1995, the trial judge ordered payment to Curtis Crane in the amount of $1,400 "for reasonable and necessary expenses incurred for seven (7) days of missed work . . . in the trial of this matter."

¶82. Woodward argues that these payments were excessive. Specifically, Woodward cites the fact that Curtis Crane was paid on two occasions when he did not testify. Woodward claims that these payments were "especially troublesome" given the behavior of the victim's family at trial. Indeed, the trial judge did take care to separate the victim's family from the defendant's family. In addition, the trial was stopped at one point when a wadded piece of foil or gum wrapper was flung on the defense table (outside the presence of the jury).

¶83. The State claims that Woodward is procedurally barred from raising this issue, because he did not raise it before the trial court. However, Woodward claims that he did not receive notice of these motions, and only discovered that these payments were made in reviewing the record for appeal. However, the orders on the first two payments to Curtis Crane were in the record prior to the resentencing trial, even though the last payment to Curtis Crane was ordered after the post-trial motion in this case was filed. Woodward clearly had notice of the payment of witness fees. However, because Woodward did not timely object to the first two payments, he waived his right to object to the third payment. *See generally Cole v. State*, 666 So. 2d 767, 773-74 (Miss. 1995). Also, Woodward did not cross-examine Crane with regard to any such payments.

¶84. Alternatively, on the merits, however, Curtis Crane's original testimony did not differ from his testimony at the resentencing trial. Therefore, the State contends that "[a]ny allegation that Mr. Crane felt he had to testify for the State because he had been paid is totally without merit." Indeed, it seems unlikely that the testimony of the victim's husband would be affected by the amount of the fee he was paid to testify. Furthermore, Curtis Crane's testimony was basically duplicative of that given by the victim's father.

¶85. Woodward also challenges the fees paid to Larry Turner (the serologist with the Mississippi Crime Laboratory who analyzed some of the evidence in this case). Turner had moved to California, and was flown back to Mississippi for the resentencing hearing. The trial judge ordered payment to Turner in the amount of $975 "for reasonable and necessary expenses incurred for testimony on September 15, 1995 through September 17, 1995 and for a rental car for the transportation of Larry Donnell Turner, an expert witness in the trial of this matter."

¶86. Turner testified that he analyzed Crane's rape kit and found seminal fluid on the oral and internal vaginal swabs. There was not a sufficient fluid sample from the victim's mouth to determine blood type, but the fluid in the vagina matched Woodward's blood type. Turner also examined the victim's clothing. He did not find any semen on her slip, panties, or external vaginal swab. This testimony really added nothing to the State's case, given that the parties stipulated that the semen found in the victim's vagina belonged to Woodward, and, given that Woodward confessed that the victim performed fellatio on him.

¶87. Nonetheless, Woodward argues that his out-of-state witness (an aunt who flew in from Phoenix, Arizona) was not given the same compensation as Turner. Woodward argues that "[t]his disparity in

treatment between the State and the defense ha[d] a subtle, but, nonetheless, prejudicial effect." This Court has previously held that "there is no method by which the out-of-state witness can be paid and that the trial court was without authority to force a witness for the defense to leave a foreign state to testify in this state." *See Chandler v. State*, 272 So. 2d 641, 643 (Miss. 1973). In *Chandler*, the defendant wished to subpoena his co-defendant; however, the same analysis applies for an out-of-state aunt. *See Id.*

¶88. After diligent search, this Court can find no authority for the amount of fees paid to Curtis and Turner. Regardless, the issue is procedurally barred and alternatively, considered on the merits, although the witnesses were improperly paid, Woodward has not demonstrated any resulting prejudice.

¶89. Of course, it is conceivable that excessive payments to witnesses could affect the outcome of a trial in some situations. However, in the case *sub judice*, there is no indication that the witnesses' testimony changed based on the payments they received. Furthermore, even if the witnesses' testimony were rejected altogether, it is clear that the same evidence would have been presented to the jury in other forms. Nonetheless, this Court urges trial judges to be extremely cautious in complying with the statutes regarding payment of witness fees in the future.

## I. WHETHER, PURSUANT TO MISS. CODE ANN. § 99-19-105(3), THE DEATH SENTENCE IMPOSED IN THIS CASE WAS FREE FROM THE INFLUENCE OF PASSION, PREJUDICE OR ANY OTHER ARBITRARY FACTOR; SUPPORTED BY THE EVIDENCE; AND PROPORTIONATE TO THE PENALTY IMPOSED IN SIMILAR CASES?

¶90. Miss. Code Ann. § 99-19-105(3) (Supp.1993) requires:

> (3) With regard to the sentence, the court shall determine:
>
> (a) Whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor;
>
> (b) Whether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance as enumerated in Section 99-19-101; and
>
> (c) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.
>
> In accordance with this section, this Court must review the record in this case and compare it with other capital murder cases in which this Court has entered judgment since *Jackson v. State*, 337 So.2d 1242 (Miss.1976). *See Irving v. State*, 361 So.2d 1360, 1370-1371 (Miss.1978).

*Carr v. State*, 655 So. 2d 824, 857 (Miss. 1995).

¶91. After thorough consideration, this Court finds that the death sentence in this case was not influenced by passion, prejudice, or any other arbitrary factor. Furthermore, the aggravating circumstances found to exist by the jury were supported by the evidence. In addition, this Court has

already held that the death sentence in this case was proportionate. ***Woodward I***, 533 So. 2d at 435. Therefore, reversal is not warranted under Miss. Code Ann. § 99-19-105(3).

## IV. <u>CONCLUSION</u>

¶92. The issues raised by Woodward on appeal are without merit. The death sentence imposed by the trial court complies with Miss. Code Ann. § 99-19-105(3). Accordingly, the imposition of the death sentence in this case is affirmed.

¶93. **CONVICTION OF CAPITAL MURDER AND SENTENCE OF DEATH BY LETHAL INJECTION AFFIRMED. EXECUTION DATE TO BE SET WITHIN SIXTY DAYS OF FINAL DISPOSITION OF THIS CASE PURSUANT TO MISS. CODE ANN. § 99-19-105(7) (1972) AND M.R.A.P. 41(a).**

**LEE, C.J., BANKS, ROBERTS, SMITH AND MILLS, JJ., CONCUR. SULLIVAN, P.J., CONCURS IN RESULT ONLY. PITTMAN AND McRAE, JJ., NOT PARTICIPATING.**

## <u>APPENDIX</u>

## <u>DEATH CASES AFFIRMED BY THIS COURT</u>

*Wells v. State,* 698 So. 2d 497 (Miss. 1997).

*Wilcher v. State,* 697 So. 2d 1123 (Miss. 1997).

*Wilcher v. State,* 697 So. 2d 1087 (Miss. 1997).

*Wiley v. State,* 691 So. 2d 959 (Miss. 1997).

*Brown v. State*, 690 So. 2d 276 (Miss. 1996).

*Simon v. State*, 688 So. 2d 791 (Miss.1997).

*Jackson v. State*, 684 So. 2d 1213 (Miss. 1996).

*Williams v. State,* 684 So. 2d 1179 (Miss. 1996).

*Davis v. State,* 684 So. 2d 643 (Miss. 1996).

*Taylor v. State*, 682 So. 2d. 359 (Miss. 1996).

*Brown v. State*, 682 So. 2d 340 (Miss. 1996).

*Blue v. State*, 674 So. 2d 1184 (Miss. 1996).

*Holly v. State*, 671 So. 2d 32 (Miss. 1996).

*Walker v. State*, 671 So. 2d 581(Miss. 1995).

*Russell v. State*, 670 So. 2d 816 (Miss. 1995).

*Ballenger v. State*, 667 So. 2d 1242 (Miss. 1995).

*Davis v. State*, 660 So. 2d 1228 (Miss. 1995).

*Carr v. State*, 655 So. 2d 824 (Miss. 1995).

*Mack v. State*, 650 So. 2d 1289 (Miss. 1994).

*Chase v. State*, 645 So. 2d 829 (Miss. 1994).

*Foster v. State*, 639 So. 2d 1263 (Miss. 1994).

*Conner v. State*, 632 So. 2d 1239 (Miss. 1993).

*Hansen v. State*, 592 So. 2d 114 (Miss. 1991).

## DEATH CASES AFFIRMED BY THIS COURT

### (continued)

*\*Shell v. State*, 554 So. 2d 887 (Miss. 1989), *Shell v. Mississippi,* 498 U.S. 1 (1990) reversing, in part, and remanding, *Shell v. State*, 595 So. 2d 1323 (Miss. 1992) remanding for new sentencing hearing.

*Davis v. State*, 551 So. 2d 165 (Miss. 1989).

*Minnick v. State*, 551 So. 2d 77 (Miss. 1989).

*\*Pinkney v. State*, 538 So. 2d 329 (Miss. 1989), *Pinkney v. Mississippi*, 494 U.S. 1075 (1990) vacating and remanding *Pinkney v. State*, 602 So. 2d 1177 (Miss. 1992) remanding for new sentencing hearing.

*\*Clemons v. State*, 535 So. 2d 1354 (Miss. 1988), *Clemons v. Mississippi*, 494 U.S. 738 (1990) vacating and remanding, *Clemons v. State*, 593 So. 2d 1004 (Miss. 1992) remanding for new sentencing hearing.

*Woodward v. State*, 533 So. 2d 418 (Miss. 1988).

*Nixon v. State*, 533 So. 2d 1078 (Miss. 1987).

*Cole v. State*, 525 So. 2d 365 (Miss. 1987).

*Lockett v. State*, 517 So. 2d 1346 (Miss. 1987).

*Lockett v. State*, 517 So. 2d 1317 (Miss. 1987).

*Faraga v. State*, 514 So. 2d 295 (Miss. 1987).

***Jones v. State**, 517 So. 2d 1295 (Miss. 1987)**, Jones v. Mississippi**, 487 U.S. 1230 (1988) vacating and remanding, **Jones v. State**, 602 So. 2d 1170 (Miss. 1992) remanding for new sentencing hearing.

*Wiley v. State*, 484 So. 2d 339 (Miss. 1986).

*Johnson v. State*, 477 So. 2d 196 (Miss. 1985).

*Gray v. State*, 472 So. 2d 409 (Miss. 1985).


## DEATH CASES AFFIRMED BY THIS COURT

### (continued)

*Cabello v. State*, 471 So. 2d 332 (Miss. 1985).

*Jordan v. State*, 464 So. 2d 475 (Miss. 1985).

*Wilcher v. State*, 455 So. 2d 727 (Miss. 1984).

*Billiot v. State*, 454 So. 2d 445 (Miss. 1984).

*Stringer v. State*, 454 So. 2d 468 (Miss. 1984).

*Dufour v. State*, 453 So. 2d 337 (Miss. 1984).

*Neal v. State*, 451 So. 2d 743 (Miss. 1984).

*Booker v. State*, 449 So. 2d 209 (Miss. 1984).

*Wilcher v. State*, 448 So. 2d 927 (Miss. 1984).

*Caldwell v. State*, 443 So. 2d 806 (Miss. 1983).

*Irving v. State*, 441 So. 2d 846 (Miss. 1983).

*Tokman v. State*, 435 So. 2d 664 (Miss. 1983).

*Leatherwood v. State*, 435 So. 2d 645 (Miss. 1983).

*Hill v. State*, 432 So. 2d 427 (Miss. 1983).

*Pruett v. State*, 431 So. 2d 1101 (Miss. 1983).

*Gilliard v. State*, 428 So. 2d 576 (Miss. 1983).

*Evans v. State*, 422 So. 2d 737 (Miss. 1982).

*King v. State*, 421 So. 2d 1009 (Miss. 1982).

*Wheat v. State*, 420 So. 2d 229 (Miss. 1982).

*Smith v. State*, 419 So. 2d 563 (Miss. 1982).

*Johnson v. State*, 416 So. 2d 383 (Miss.1982).

*Edwards v. State*, 413 So. 2d 1007 (Miss. 1982).

*Bullock v. State*, 391 So. 2d 601 (Miss. 1980).

*Reddix v. State*, 381 So. 2d 999 (Miss. 1980).

## DEATH CASES AFFIRMED BY THIS COURT

### (continued)

*Jones v. State*, 381 So. 2d 983 (Miss. 1980).

*Culberson v. State*, 379 So. 2d 499 (Miss. 1979).

*Gray v. State*, 375 So. 2d 994 (Miss. 1979).

*Jordan v. State*, 365 So. 2d 1198 (Miss. 1978).

*Voyles v. State*, 362 So. 2d 1236 (Miss. 1978).

*Irving v. State*, 361 So. 2d 1360 (Miss. 1978).

*Washington v. State*, 361 So. 2d 61 (Miss. 1978).

*Bell v. State*, 360 So. 2d 1206 (Miss. 1978).

\* Case was originally affirmed in this Court but on remand from U. S. Supreme Court, case was remanded by this Court for a new sentencing hearing.

## DEATH CASES REVERSED AS TO GUILT PHASE

## AND SENTENCE PHASE

*Snelson v. State,* --- So. 2d --- (Miss. 1997).

*Fusilier v. State,* --- So. 2d --- (Miss. 1997).

*Howard v. State,* 697 So. 2d 415 (Miss. 1997).

*Lester v. State,* 692 So. 2d 755 (Miss. 1997).

*Hunter v. State*, 684 So. 2d 625 (Miss. 1996).

*Lanier v. State*, 684 So. 2d 93 (Miss. 1996).

*Giles v. State,* 650 So. 2d 846 (Miss. 1995).

*Duplantis v. State*, 644 So. 2d 1235 (Miss. 1994).

*Harrison v. State*, 635 So. 2d 894 (Miss. 1994).

*Butler v. State*, 608 So. 2d 314 (Miss. 1992).

*Jenkins v. State*, 607 So. 2d 1171 (Miss. 1992).

*Abram v. State*, 606 So. 2d 1015 (Miss. 1992).

*Balfour v. State*, 598 So. 2d 731 (Miss. 1992).

*Griffin v. State*, 557 So. 2d 542 (Miss. 1990).

*Bevill v. State*, 556 So. 2d 699 (Miss. 1990).

*West v. State*, 553 So. 2d 8 (Miss. 1989).

*Leatherwood v. State*, 548 So. 2d 389 (Miss. 1989).

*Mease v. State*, 539 So. 2d 1324 (Miss. 1989).

*Houston v. State*, 531 So. 2d 598 (Miss. 1988).

*West v. State*, 519 So. 2d 418 (Miss. 1988).

*Davis v. State*, 512 So. 2d 129l (Miss. 1987).

*Williamson v. State*, 512 So. 2d 868 (Miss. 1987).

*Foster v. State*, 508 So. 2d 1111 (Miss. 1987).

*Smith v. State*, 499 So. 2d 750 (Miss. 1986).

## DEATH CASES REVERSED AS TO GUILT PHASE

## AND SENTENCE PHASE

### (**continued**)

*West v. State*, 485 So. 2d 681 (Miss. 1985).

*Fisher v. State*, 481 So. 2d 203 (Miss. 1985).

*Johnson v. State*, 476 So. 2d 1195 (Miss. 1985).

*Fuselier v. State*, 468 So. 2d 45 (Miss. 1985).

*West v. State*, 463 So. 2d 1048 (Miss. 1985).

*Jones v. State*, 461 So. 2d 686 (Miss. 1984).

*Moffett v. State*, 456 So. 2d 714 (Miss. 1984).

*Lanier v. State*, 450 So. 2d 69 (Miss. 1984).

*Laney v. State*, 421 So. 2d 1216 (Miss. 1982).


## DEATH CASES REVERSED

## AS TO PUNISHMENT AND REMANDED

## FOR RESENTENCING TO LIFE IMPRISONMENT

*Reddix v. State*, 547 So. 2d 792 (Miss. 1989).

*Wheeler v. State*, 536 So. 2d 1341 (Miss. 1988).

*White v. State*, 532 So. 2d 1207 (Miss. 1988).

*Bullock v. State*, 525 So. 2d 764 (Miss. 1987).

*Edwards v. State*, 441 So. 2d 84 (Miss. l983).

*Dycus v. State*, 440 So. 2d 246 (Miss. 1983).

*Coleman v. State*, 378 So. 2d 640 (Miss. 1979).

## DEATH CASES REVERSED AS TO

## PUNISHMENT AND REMANDED FOR A NEW TRIAL

## <u>ON SENTENCING PHASE ONLY</u>

*Booker v. State*, 699 So. 2d 132 (Miss. 1997).

*Taylor v. State*, 672 So. 2d 1246 (Miss. 1996).

**Shell v. State*, 554 So. 2d 887 (Miss. 1989), *Shell v. Mississippi*, 498 U.S. 1 (1990) reversing, in part, and remanding, *Shell v. State* 595 So. 2d 1323 (Miss. 1992) remanding for new sentencing hearing.

*\*Pinkney v. State*, 538 So. 2d 329 (Miss. 1989), *Pinkney v. Mississippi,* 494 U.S. 1075 (1990) vacating and remanding, *Pinkney v. State,* 602 So. 2d 1177 (Miss. 1992) remanding for new sentencing hearing.

**Clemons v. State*, 535 So. 2d 1354 (Miss. 1988), *Clemons v. Mississippi*, 494 U.S. 738 (1990) vacating and remanding, *Clemons v. State*, 593 So. 2d 1004 (Miss. 1992) remanding for new sentencing hearing.

**Jones v. State*, 517 So. 2d 1295 (Miss. 1987), *Jones v. Mississippi,* 487 U.S. 1230 (1988) vacating and remanding, *Jones v. State*, 602 So. 2d 1170 (Miss. 1992) remanding for new sentencing hearing.

*Russell v. State*, 607 So. 2d 1107 (Miss. 1992).

*Holland v. State*, 587 So. 2d 848 (Miss. 1991).

*Willie v. State*, 585 So. 2d 660 (Miss. 1991).

*Ladner v. State*, 584 So. 2d 743 (Miss. 1991).

*Mackbee v. State*, 575 So. 2d 16 (Miss. 1990).

*Berry v. State*, 575 So. 2d 1 (Miss. 1990).

*Turner v. State*, 573 So. 2d 657 (Miss. 1990).

*State v. Tokman*, 564 So. 2d 1339 (Miss. 1990).

*Johnson v. State*, 547 So. 2d 59 (Miss. 1989).

*Williams v. State*, 544 So. 2d 782 (Miss. 1989); *sentence aff'd* 684 So. 2d 1179 (Miss. 1996)

*Lanier v. State*, 533 So. 2d 473 (Miss. 1988).

## DEATH CASES REVERSED AS TO

## PUNISHMENT AND REMANDED FOR A NEW TRIAL

## <u>ON SENTENCING PHASE ONLY</u>

## <u>(continued)</u>

*Stringer v. State*, 500 So. 2d 928 (Miss. 1986).

*Pinkton v. State*, 481 So. 2d 306 (Miss. 1985).

*Mhoon v. State*, 464 So. 2d 77 (Miss. 1985).

*Cannaday v. State*, 455 So. 2d 713 (Miss. 1984).

*Wiley v. State*, 449 So. 2d 756 (Miss. 1984); resentencing affirmed, *Wiley v. State*, 484 So. 2d 339 (Miss. 1986), *cert. denied Wiley v. Mississippi*, 479 U.S. 1036 (1988); resentencing ordered, *Wiley v. State,* 635 So. 2d 802 (Miss. 1993) following writ of habeas corpus issued pursuant to *Wiley v. Puckett*, 969 So. 2d 86, 105-106 (5th Cir. 1992); resentencing affirmed, *Wiley v. State*, 95-DP-00149, February 13, 1997 (rehearing pending).

*Williams v. State*, 445 So. 2d 798 (Miss. 1984).


* Case was originally affirmed in this Court but on remand from U. S. Supreme Court, case was remanded by this Court for a new sentencing hearing.



1. It should be noted that these photographs were not particularly gruesome. One is a wide-angle shot of the crime scene, in which the victim's torso appears. There are some white, discolored spots on her legs; the doctor who performed the autopsy testified that this was due to sun exposure. The victim's face is not in the picture. The other is a picture of the victim's entire body. It shows blood on her face; the doctor who performed the autopsy testified that this was expelled from her lungs after death. There also appears to be some bruising on the left side of the victim's face; the doctor who performed the autopsy testified that this was caused by the gravitation of blood to the lowest point. The photographs, although unpleasant, were neither gory nor gruesome.

2. Woodward's argument is somewhat incongruous, in that he argues that there was no evidence to support the "heinous, atrocious, or cruel" aggravator, but admits that the condition of the victim's

face presented evidence from which the jury might "erroneously" infer that dismemberment, mutilation, or torture had taken place. However, even if the victim appeared to have been beaten, there is absolutely no evidence in the record that she was seriously mutilated or dismembered. Indeed, the State admitted this fact in its closing argument, when emphasizing the instructions to the jury.

3. The jury could have undoubtedly determined that the victim suffered from mental torture prior to her death. She was forced from the road in broad daylight, abducted from her cranked vehicle in the center of a public highway, taken at gunpoint to a remote place in the woods where she was brutally sexually battered, forced to perform fellatio on Woodward, raped, and then killed. Such evidence more than sufficiently set this crime apart from the norm of murders.