# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 1999-DR-00618-SCT

*PAUL EVERETTE WOODWARD*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 9/20/1995 |
| TRIAL JUDGE: | HON. RICHARD W. McKENZIE |
| COURT FROM WHICH APPEALED: | PERRY COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | WILLIAM B. KIRKSEY |
| | NATHAN H. ELMORE |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: MARVIN L. WHITE, JR. |
| | JEFFREY A. KLINGFUSS |
| NATURE OF THE CASE: | CIVIL - DEATH PENALTY - POST CONVICTION |
| DISPOSITION: | POST-CONVICTION RELIEF DENIED - 03/06/2003 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**EASLEY, JUSTICE, FOR THE COURT:**

## STATEMENT OF THE CASE

¶1.     Paul Everette Woodward was convicted of the crimes of capital murder (with the underlying crime of rape), kidnapping and sexual battery of Rhonda Crane and sentenced to death in 1987. Woodward's conviction and sentence were affirmed by this Court in ***Woodward v. State***, 533 So.2d 418 (Miss. 1988), *cert. denied*, 490 U.S. 1028, 109 S.Ct. 1767, 104 L.Ed.2d 202 (1989), *reh'g denied*, 490 U.S. 1117, 109 S.Ct. 3179, 107 L.Ed.2d 1041 (1989). In 1993 this Court granted Woodward's motion

for post-conviction relief and remanded the case for re-sentencing on the capital murder charge. *Woodward v. State*, 635 So.2d 805 (Miss. 1993). On remand, the circuit court again imposed the death sentence. Woodward's second death sentence was affirmed by this Court in *Woodward v. State*, 726 So.2d 524 (Miss. 1997), *cert. denied*, 526 U.S. 1041, 119 S.Ct. 1338, 143 L.Ed.2d 502 (1999).

¶2.     Woodward filed his Pro Se Petition for Post-Conviction Relief on April 7, 1999. On December 3, 2001, appointed counsel filed an Application for Leave to File Motion to Vacate Death Sentence, which is presently before the Court. The State has filed its response to the application.

### FACTS AND PROCEDURAL HISTORY

¶3.     Around noon on July 23, 1986, Rhonda Crane, age twenty-four, was traveling on Mississippi Highway 29 south of New Augusta in Perry County, Mississippi to join her parents on a camping trip. A white male driving a white log truck forced her car to stop in the middle of the road. The white male then exited the truck with a pistol in his hand and forced Crane to get into his truck. The man then drove the victim to an isolated area, forced her out of his truck and into the woods at gunpoint and forced her to have sexual relations with him. Rhonda Crane was shot in the back of her head and died.

¶4.     Crane's automobile was left on the highway with the engine running, the driver's door open and her purse on the car seat. A motorist traveling in a vehicle on the same highway saw a white colored, unloaded, logging truck moving away from the Crane vehicle, and notified the authorities. Additionally, a housewife residing on a bluff along the highway at the location of the Crane car noted a logging truck with a white cab stop in front of her driveway. A white male exited and walked toward the back of his truck and returned with a blonde haired woman wearing yellow clothing. As he held her by her arm, the male yelled sufficiently loud for the housewife to hear the words "get in, get in," and forced the blonde woman

into the driver's door of the truck and then drove off. The housewife investigated the scene on the highway in front of her house, discovered the abandoned Crane car, and notified the authorities.

¶5.     Law enforcement officers began an investigation to locate Crane. The officers discovered that Paul Everette Woodward unloaded logs at a pulp mill and departed the yard at 11:36 a.m. in a white Mack log truck. Woodward arrived at his wood yard at approximately 12:45 to 1:00 p.m. The yard manager noted that he was late arriving at the yard and was wet from sweating. A drive from the mill to the wood yard takes approximately thirty minutes. A sheriff's deputy stopped Woodward, who was driving a white Mack logging truck, around 2:00 p.m. on the afternoon of July 23, to ask if he had seen anything that would assist in the investigation of Rhonda Crane's disappearance. Woodward replied that he had not seen anything. Through the investigation, it was ascertained that Woodward was the only driver of a white logging truck operating at the nearby timber yards on that date. On the following day, Crane's body was located in the nearby wooded area by her father and a friend.

¶6.     Woodward was arrested, and ultimately he made both written and videotaped confessions. Woodward also confessed to his employer over the telephone. He was charged under a multi-count indictment with three charges: capital murder with an underlying crime of rape; kidnapping; and oral sexual battery. Upon a motion for change of venue, Woodward was tried before a jury in Hinds County and convicted of all three counts of the indictment. After a separate sentencing hearing, the jury sentenced Woodward to death. On direct appeal, Woodward raised numerous issues regarding the guilt/innocence phase and the sentencing phase of his first trial. This Court affirmed the conviction and sentence. *Woodward v. State*, 533 So.2d 418 (Miss. 1988) (hereinafter *Woodward I*), *cert. denied*, 490 U.S. 1028, 109 S.Ct. 1767, 104 L.Ed.2d 202 (1989), *reh'g denied*, 490 U.S. 1117, 109 S.Ct. 3179, 104 L.Ed.2d 1041 (1989).

3

¶7.     In Woodward's first application for post-conviction relief he raised eleven issues. This Court considered the issue of ineffective assistance of counsel and the issues affecting the guilt portion of the trial. On October 7, 1993, citing *Clemons v. Mississippi*, 494 U.S. 738, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990), this Court granted Woodward's motion for post-conviction relief, and remanded the case for re-sentencing on the capital murder charge. This Court held that Woodward's death sentence was improper because the sentencing jury was incorrectly instructed regarding the "especially heinous, atrocious, or cruel" aggravating circumstance. *Woodward v. State*, 635 So.2d 805 (Miss. 1993) (hereinafter *Woodward II*). This Court additionally found that Woodward's trial counsel were ineffective during the sentencing phase of his trial because counsel failed to offer all of the evidence they had in mitigation. The ineffective counsel issue provided an independent reason to reverse the sentence and remand it for a new trial on sentencing. *Id*. at 810. However, this Court further found that Woodward could not meet the prejudice prong of the *Strickland* test as to the guilt phase of his trial. *Woodward II*, 635 So.2d at 809.

¶8.     On remand for re-sentencing on the capital murder charge, the trial judge granted Woodward's motion to withdraw the motion for change of venue. The case was originally set for trial on September 19, 1994, however, due to the disqualification of several jurors, the court was unable to seat a jury. The case was reset and, on September 20, 1995, the jury rendered its verdict that Woodward be sentenced to death. On direct appeal, this Court affirmed. *Woodward v. State*, 726 So.2d 524 (Miss. 1997) (hereinafter *Woodward III*), *cert. denied*, 526 U.S. 1041, 119 S.Ct. 1338, 143 L.Ed.2d 502 (1999).

¶9.     Woodward filed his Pro Se Petition for Post-Conviction Relief on April 7, 1999. On December 3, 2001, appointed counsel filed an Application for Leave to File Motion to Vacate Death Sentence, which is presently before the Court. The State has filed its response to the application.

¶10.    In his pro se petition, Woodward raises four claims:

4

**I.** Ineffective assistance of counsel at trial in culpability phase.

**II.** Ineffective assistance of counsel at trial in sentencing phase.

**III.** Ineffective assistance of counsel on appeal.

**IV.** The defense did not receive all the material that the State should have provided in discovery. The defense did not receive all exculpatory material.

¶11. Woodward's attorneys raise the following eleven contentions in the Application for Leave to File

Motion to Vacate Death Sentence:

**I.** Woodward's defense counsel failed to prevent the jury from hearing about the prior convictions, arrests and bad acts of the Defendant.

**II.** Woodward's counsel failed to make sure the Court's written orders reflected the rulings from the bench.

**III.** The trial court erred in denying Defendant's motion to compel disclosure of information regarding mitigating circumstances.

**IV.** The State's expert witness Dr. Charlton Stanley was unqualified to render an opinion on the mental state of Paul Woodward.

**V.** The State failed to disclose the opinions of Dr. Stanley.

**VI.** Trial Counsel was ineffective for failing to send Woodward to Whitfield State Hospital for a competency hearing.

**VII.** Defense expert Dr. Clarence Thurman was ineffective.

**VIII.** Defense Counsel erred in withdrawing their motion for change of venue.

**IX.** Defense Counsel failed to properly investigate the case.

**X.** Defense Counsel failed to admit medical records substantiating Woodward's claim that he was shot in the back of the head.

**XI.    The Court erred in instructing the jury that it should not be influenced by sympathy.**

### ANALYSIS

¶12.    In his pro se petition, Woodward asserts that his counsel did not provide adequate representation at the time of trial, during the sentencing proceeding, and on appeal.  Woodward contends that, but for these inadequacies, the outcome of the culpability phase, sentencing phase, and appeal would have been different.  Woodward also contends that the State did not provide all material it should have in discovery.  Woodward does not refer to any facts and does not cite any authority in his pro se petition.

¶13.    The matter before this Court relates only to the second sentencing trial.  This Court has considered numerous issues raised in Woodward's two direct appeals and his earlier post-conviction-relief petition. "The doctrine of res judicata shall apply to all issues, both factual and legal, decided at trial and on direct appeal."  Miss. Code Ann. § 99-39-21(3) (Supp. 2002).  Additionally, any claim raised in this application which was considered by this Court in Woodward's first post-conviction-relief petition would constitute a second petition and is barred as a successive writ. *Id*. § 99-39-27(9).

¶14.    Rex K. Jones and Jeff Bradley represented Woodward during his first trial in 1987 and during his appeal of his conviction and sentence.  Terryl Rushing and Elizabeth DeCoux represented Woodward during his first petition for post-conviction relief.  Michael Adelman and Terryl Rushing represented Woodward during his re-sentencing trial and during his appeal of that sentence.  The standard for determining if a defendant received effective assistance of counsel is well settled.  "The benchmark for judging any claim of ineffectiveness [of counsel] must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674

6

(1984). A defendant must demonstrate that his counsel's performance was deficient and that the deficiency prejudiced the defense of the case. *Id.* at 687, 104 S.Ct. at 2064. "Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable." *Stringer v. State*, 454 So.2d 468, 477 (Miss. 1984), citing *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064. The focus of the inquiry must be whether counsel's assistance was reasonable considering all the circumstances. *Id.*

> Judicial scrutiny of counsel's performance must be highly deferential. (citation omitted) . . . A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'

*Stringer*, 454 So.2d at 477, citing *Strickland* 466 U.S. at 689, 104 S.Ct. at 2065. Defense counsel is presumed competent. *See Finley v. State*, 725 So.2d 226, 238 (Miss. 1998), quoting *Foster v. State*, 687 So.2d 1124, 1130 (Miss. 1996). *See also Johnson v. State*, 476 So.2d 1195, 1204 (Miss. 1985).

> Then, to determine the second prong of prejudice to the defense, the standard is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Mohr v. State*, 584 So.2d 426, 430 (Miss.1991). This means a "probability sufficient to undermine the confidence in the outcome." *Id.* The question here is
>
> > whether there is a reasonable probability that, absent the errors, the sentencer--including an appellate court, to the extent it independently reweighs the evidence--would have concluded that the balance of the aggravating and mitigating circumstances did not warrant death. *Strickland*, 466 U.S. at 695, 104 S.Ct. at 2068.

7

There is no constitutional right then to errorless counsel. *Cabello v. State,* 524 So.2d 313, 315 (Miss.1988); *Mohr v. State,* 584 So.2d 426, 430 (Miss.1991) (right to effective counsel does not entitle defendant to have an attorney who makes no mistakes at trial; defendant just has right to have competent counsel). If the post-conviction application fails on either of the *Strickland* prongs, the proceedings end. *Neal v. State,* 525 So.2d 1279, 1281 (Miss.1987); *Mohr v. State,* 584 So.2d 426 (Miss.1991).

*Davis v. State,* 743 So.2d 326, 334 (Miss. 1999), citing *Foster v. State,* 687 So.2d 1124, 1130 (Miss. 1996).

¶15.   In Woodward's first application for post-conviction relief, this Court considered the issue of ineffective assistance of counsel and the issues affecting the guilt portion of the trial. This Court found that Woodward's trial counsel, Jones and Bradley, were ineffective during the sentencing phase of his trial. However, this Court further found that Woodward could not meet the prejudice prong of the *Strickland* test as to the guilt phase of his trial. *Woodward II*, 635 So.2d at 809-10. Woodward's present assertion that his counsel were ineffective during the culpability phase of his trial is barred by the doctrine of res judicata. Miss. Code Ann. § 99-39-21(3). Additionally, "[a] convicted defendant making a claim of ineffective assistance of counsel must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Strickland*, 466 U.S. at 690, 104 S.Ct. at 2066. Woodward has failed to identify any acts or omissions of his counsel in his pro se petition. Accordingly, Woodward, in his pro se petition, has failed to demonstrate that his counsels' performance during the sentencing phase and/or on appeal was deficient and that the deficiency prejudiced the defense of his case. These issues are without merit.

¶16.   Woodward also contends that the State did not provide all material it should have in discovery. Woodward does not refer to any facts and does not cite any authority in his pro se petition. Woodward has failed to show that there was any discovery violation. Accordingly, this issue is also without merit.

8

¶17.    On December 3, 2001, appointed counsel filed an Application for Leave to File Motion to Vacate Death Sentence, in which they raise eleven issues. The majority of the issues presented relate to claims of ineffective assistance of counsel.

### I. Whether Woodward's defense counsel failed to prevent the jury from hearing about the prior convictions, arrests and bad acts of the Defendant.

¶18.    Woodward asserts that his sentence must be vacated because the jury heard evidence of his prior bad acts. Woodward argues that this evidence was incompetent and inflammatory in character and thus carries with it a presumption of prejudice. Woodward contends that the admission of the evidence of prior bad acts was the reason the jury did not list "lack of serious criminal history" as a mitigating factor in their verdict.

¶19.    During opening statements, Woodward's attorney told the jury about a "dark influence" over him and that he had claimed to have conversations with the devil. During the defense's case-in-chief, Woodward's trial counsel called several witnesses who testified about Woodward's background, including his arrest for stealing a car, his arrest for attempted murder in Louisiana, and his claim to have conversations with the devil. The defense also called Dr. Clarence Thurman, a clinical psychologist. During cross-examination of Dr. Thurman, the prosecutor had Dr. Thurman read from a report prepared in 1971, during Woodward's commitment to the state hospital at Whitfield. That report included a statement from Woodward's wife that, during one of his blackouts, Woodward lost control and abused her. That report included another statement from Woodward's wife that he could not recall attempting to strangle a girl in Louisiana. That report included Woodward's explanation of a suicide attempt as a prank on his wife. In his closing argument, the prosecutor discussed Woodward's arrests and other bad acts and argued that this evidence negated Woodward's mitigation argument that he had no significant criminal history.

9

¶20.  Woodward asserts that his trial counsel were ineffective for introducing this evidence and failing to object during the prosecution's questioning of these witnesses.  The affidavits of Michael Adelman and Terryl Rushing, Woodward's trial counsel, show otherwise.  Counsel both state that it was their trial strategy to admit evidence that showed that Woodward was basically a good person who had been troubled all of his life, in an effort to show mitigating circumstances existed.  In her affidavit, Terryl Rushing states,

> During the defense's case-in-chief, we introduced testimony regarding Paul's arrest and conviction for auto theft in about 1968 and his arrest for attempted murder and/or attempted rape in Louisiana in about 1971.  Paul was never tried or convicted on the Louisiana charges.  There was confusion over the exact charge in Louisiana and I never found out for certain what the charge was, although I understand Paul was indicted.  We introduced testimony regarding these crimes because we feared the prosecution would be able to get into them, anyway.
>
> One reason for admitting these prior bad acts was our defense theory that Paul had been "troubled" all his life and had wrestled with good versus evil.  He had always striven to do the right thing but was overwhelmed at the time he killed Rhonda Crane.  This theory was also supported by conversations Paul claimed to have had with the devil which were also introduced by the Defense in its case-in-chief.

In his affidavit, Michael Adelman states,

> At the sentencing trial we tried to humanize Paul for the jury by presenting him as a troubled guy who struggled to do the right thing.  We presented evidence of Paul's arrest and conviction for auto theft in Memphis in about 1968 as well as Paul's arrest for attempted murder and/or rape in Louisiana for which he was not convicted.  We also presented testimony regarding conversations Paul claimed to have had with the devil.  Testimony concerning these matters was presented during the defense case-in-chief even though they were not mentioned by the State during its case-in-chief.

Woodward's main mitigation argument was that he was mentally ill.  It is clear from the record that Adelman and Rushing, through friendly witnesses, presented the evidence of Woodward's prior bad acts in the context that those acts were examples of Woodward's long battle with mental illness.

¶21.    Woodward also argues that his trial counsel failed to object during the cross-examination of Dr. Thurman.   The cross-examination of Dr. Thurman was not nearly as damaging as Woodward now contends.  Dr. Thurman's report regarding Woodward's history of mental illness included statements made during Woodward's commitment to the state hospital at Whitfield.  During cross-examination, Dr. Thurman was able to point out that Woodward had suffered from unexplained blackouts, and that the reports showed that Woodward had suffered from a "long history of emotional problems, . . . that in 1971 he completely lost control, attempted to strangle his wife that he loved."  Additionally, since Woodward's prior criminal history was included in Dr. Thurman's report as part of the information which formed the basis for his opinions, Woodward's trial counsel could not have been successful in any objection raised regarding the contents of the report.  *See* M.R.E. 611(b), 703 & 705.

¶22.    Adelman and Rushing made strategic choices regarding the mitigation case to be made.  This does not show deficient performance, but sound trial strategy.  Woodward has failed to "overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'"  *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065 (citations omitted).  Accordingly, Woodward has not shown that his trial counsels' performance was deficient, nor has he shown any prejudice to his defense.  This issue is without merit.

### II.    Whether Woodward's counsel failed to make sure the Court's written orders reflected the rulings from the bench.

¶23.    Woodward argues that his trial counsel were ineffective when they failed to make sure that the written order regarding a motion reflected the ruling from the bench.  On September 10, 1986, Woodward's attorneys, Jones and Bradley, filed a motion in limine seeking to enjoin the prosecution from referring to prior acts, arrests, and convictions of Woodward.  Adelman and Rushing renewed that motion

prior to the re-sentencing trial. Woodward argues that during the hearing on that motion, the trial court ordered that the ruling would be held in abeyance, but that the order that was entered stated that the motion was denied. Woodward further asserts that his counsel were ineffective when they failed to object when the prosecution touched on these matters.

¶24. Woodward has ignored facts relevant to this issue. Prior to trial, both sides presented numerous motions to be ruled on, including several motions in limine. During the hearing on the subject motion, the trial court agreed that arguments would be heard when the issue came up during trial. Woodward asserts that an order, drafted by the prosecution without approval of the defense, was entered denying the subject motion. However, Woodward ignores the fact that numerous orders were entered by the trial court on the same day, including an order that specifically stated that "the Court will not rule until such time as a [sic] new testimony is attempted to be offered in connection with the evidence of other crimes." One order held the specific issues involved in the subject motion in abeyance, while the other order denied all other motions in limine. Woodward has failed to show any deficient performance by his counsel and has failed to show any prejudice to his defense. This issue is without merit.

¶25. Woodward also argues that his counsel were ineffective when they failed to object when the State touched on these matters. This argument was addressed earlier and is without merit.

> **III. Whether the trial court erred in denying Defendant's motion to compel disclosure of information regarding mitigating circumstances.**

¶26. Woodward argues that the trial court erred in failing to grant his motion to compel disclosure of information relating to the mitigating circumstances, filed by Woodward's counsel, Jones and Bradley, on September 10, 1986. The trial court's order states,

12

> IT IS THEREFORE ORDERED AND ADJUDGED, that the Motion to Compel Disclosure of Aggravating Circumstances is hereby overruled and denied in all particulars; *however, the State is required to produce and [sic] information relating to mitigating circumstances pursuant to discovery, as well as <u>Brady</u> requirements.*

(emphasis added). The State correctly points out that this claim is barred by the provisions of Miss. Code Ann. § 99-39-21(1). Woodward failed to raise a claim regarding this matter at trial and/or on direct appeal. Without waiving that bar, this issue is also without merit. The trial court actually granted the relief that Woodward now complains was denied him.

## IV. Whether the State's expert witness Dr. Charlton Stanley was unqualified to render an opinion on the mental state of Paul Woodward.

¶27. Woodward argues that the prosecution's expert witness was not qualified to render an opinion regarding Woodward's mental state. During the defense's case-in-chief, Dr. Thurman testified that Woodward had a longstanding emotional problem, dating back to his teen years, and that Woodward was and is emotionally disturbed. Dr. Thurman testified that, at the time of the crime, Woodward's ability to appreciate the criminality of his conduct was impaired, that Woodward's capacity to conform his conduct to the requirements of the law was impaired, and that Woodward was a mentally disturbed individual. In rebuttal, the prosecution called Dr. Stanley, who was accepted as an expert witness in the areas of forensic psychology and counseling psychology. Dr. Stanley testified that he did not agree that Woodward had a longstanding mental disorder, nor could he find data to suggest that Woodward was under the influence of extreme mental or emotional disturbance at the time of the crime. Dr. Stanley also testified that he thought Woodward's ability to appreciate the criminality of his conduct and his ability to conform his conduct at the time of the crime were not impaired.

13

¶28. Woodward asserts that none of Dr. Stanley's opinions were reduced to writing, nor did Dr. Stanley interview Woodward. Woodward argues that an expert may not testify based solely on the opinions and testimony of other experts. Woodward contends that Dr. Stanley's testimony was inadmissible because his opinions could not pass the "reasonable certainty" test. Woodward also argues that his trial counsel were ineffective for failing to object to Dr. Stanley's testimony and that the failure of trial court to exclude the testimony was prejudicial to the defense.

¶29. The State correctly points out that Woodward failed to object to Dr. Stanley's testimony both at trial and on appeal. Therefore, Woodward's claim that the admission of the testimony was error is barred from consideration by Miss. Code. Ann. § 99-39-21. Without waiving that bar, the State argues that this issue is also without merit, as is Woodward's contention that his trial counsel were ineffective for failing to object to the testimony. This Court agrees.

¶30. Woodward contends that Dr. Stanley's opinions were not reduced to writing nor discovered by the defense prior to trial. Woodward asserts that his right to confrontation and cross-examination was violated. However, Dr. Stanley testified for the prosecution during Woodward's first trial and, since Woodward had the transcript from that proceeding, he cannot now claim that he was surprised by the testimony.

¶31. Woodward argues that since Dr. Stanley never personally interviewed Woodward, Dr. Stanley's opinions about Woodward could not have the degree of certainty required for admission as expert opinions. Dr. Stanley based his opinions about Woodward on the documents in Dr. Thurman's file, audiotapes of Dr. Thurman's interviews with Woodward, and Woodward's videotaped and written confessions. Woodward argues that Dr. Stanley's failure to interview him makes his testimony objectionable. M.R.E. 703 states,

14

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

This Court has held that there is no requirement that a mental health professional actually examine the defendant before testifying. This Court has stated,

> there is no merit to McGilberry's claim that Dr. Maggio was required to examine personally the defendant and/or speak with defense counsel. An expert's opinion may be based on facts or data "made known to him at or before the hearing." M.R.E. 703. Furthermore, his opinion may be based on the testimony of others which he heard while sitting in the courtroom. *Id.* Likewise, Mississippi's case law supports the position that an expert may base his opinion solely on the testimony of others he has witnessed. *See Collins v. State*, 361 So.2d 333, 334 (Miss. 1978) (expert witness may remain in courtroom and base his testimony upon the prior testimony of other witnesses). This method is particularly useful in criminal cases. *Id.*

*McGilberry v. State*, 741 So.2d 894, 918 (Miss. 1999). *See also McCaffrey v Puckett*, 784 So.2d 197, 203 (Miss. 2001); *Sibley v. Unifirst Bank for Sav.*, 699 So.2d 1214, 1219 (Miss. 1997). Woodward's contention that Dr. Stanley had to interview Woodward for his testimony to be admissible is without merit.

¶32. Woodward finally argues that his trial counsels' failure to object to the admission of Dr. Stanley's testimony was error and prejudiced the defense. Any objection defense counsel might have raised would have been properly overruled. Woodward has failed to show that his counsels' performance was deficient and has failed to show any prejudice. *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064. This issue is also without merit.

### V. Whether the State failed to disclose the opinions of Dr. Stanley.

¶33. Woodward argues that, to the extent that Dr. Stanley's testimony was based on anything other than Dr. Thurman's testimony at trial, it was more than rebuttal and should have been disclosed to the defense

prior to trial. Woodward again contends that Dr. Stanley had a duty to write a report and that report should have been given to the defense prior to trial. Woodward asserts that, although the defense counsel were given a brief opportunity to interview Dr. Stanley just before he testified, that the interview was not sufficient to allow the defense to formulate a proper response and prejudiced the defense. Woodward argues that URCCC 9.04(A)(4) required the prosecution to disclose a report of Dr. Stanley, prior to trial. Woodward contends that this violation unfairly impeded his attempts to persuade the jury to grant him mitigating factors.

¶34. The State contends that Woodward's claim that the prosecution committed a fatal discovery violation requiring the vacation of his death sentence is without merit. This Court agrees. URCCC 9.04(A)(4) states,

> A. Subject to the exceptions of subsection "B," below, the prosecution must disclose to each defendant or to defendant's attorney, and permit the defendant or defendant's attorney to inspect, copy, test, and photograph upon written request and without the necessity of court order the following which is in the possession, custody, or control of the State, the existence of which is known or by the exercise of due diligence may become known to the prosecution:
> 4. Any reports, statements, or opinions of experts, written, recorded or otherwise preserved, made in connection with the particular case and the substance of any oral statement made by any such expert;

The prosecution did not have a duty to produce a written report, which did not exist, so long as the substance of any oral statements were furnished. Woodward was not surprised by Dr. Stanley's testimony and cannot claim prejudice. Dr. Stanley testified during Woodward's first trial, and Woodward had the transcript of that testimony. Additionally, Dr. Stanley's testimony did not go beyond the scope of rebuttal. This issue is without merit.

**VI.  Whether Trial Counsel was ineffective for failing to send Woodward to Whitfield State Hospital for a competency hearing.**

16

¶35. On September 10, 1986, Woodward's counsel, Jones and Bradley, filed numerous motions regarding Woodward's mental evaluation. In the Motion for Psychiatric Examination of Defendant, counsel requested that Woodward be examined by a psychiatrist for determination of his mental competency at the time of the crime. In the Motion for Funds for Psychiatrist, counsel requested funds to employ a psychiatrist to conduct an evaluation of Woodward's capacity for criminal responsibility. In the Motion for Funds for Private Psychiatric Testimony at Sentencing Hearing, counsel requested funds to employ a private psychiatrist or psychologist to testify on behalf of Woodward regarding mitigating circumstances, in case there was a sentencing hearing. In the Motion for Private Psychiatric Examination and Testing, counsel requested that the court grant Woodward the right to be examined by private psychiatrist, psychologist and other medical experts to determine his sanity at the time of the crime and his ability to aid in his defense. In the Defendant's Motion for Funds to Conduct a Psychiatric Examination, counsel again requested funds to conduct a psychiatric examination.

¶36. Prior to the re-sentencing trial, Woodward's counsel, Michael Adelman, renewed those motions and specifically requested funds to employ Dr. John Ritter, a psychiatrist and neurologist. Adelman argued that they did not want a re-examination at Whitfield. Adelman further stated that the motion for psychiatric evaluation, "in terms of Whitfield, or that type of examination" was moot. After the defense and the prosecution made their arguments regarding the motions, the following colloquy occurred,

> Trial Court: I am going to allow Dr. Thurman to continue, if he needs additional funds for additional tests and evaluation, certainly we would grant those, and also am going to allow Mr. Woodward, if he desires for him to do so, to be evaluated by the staff at Whitfield. If you desire that, we will get an order to that effect.
> All right. No. 21.

> Adelman: If I understand the Court's ruling, he can continue with Dr. Thurman.

| | |
|---|---|
| Trial Court: | Yes. |
| Adelman: | By the way I have discussed with Dr. Thurman and Dr. Thurman has indicated that he would want to see Mr. Woodward. |
| Trial Court: | I have no problem with that. |
| Adelman: | And the question whether or not, he would - we will have to discuss that with Mr. Woodward. |
| Trial Court: | And if you want him to be re-evaluated by Whitfield, we will. |
| Adelman: | But as far as Dr. Ritter, you are denying those funds? |
| Trial Court: | Yes. |

On April 26, 1994, the trial court entered its order stating,

> IT IS, THEREFORE, ORDERED AND ADJUDGED, that the defendant be allowed evaluation at Mississippi State Hospital if he so desires psychiatric examination, and to continue to have at his disposal Dr. Clarence Th[u]rman, who has previously examined the defendant, as well as testified in connection with this matter for the defendant's behalf, and to allow the defendant additional funds to continue any examination and treatment of the defendant by Dr. Clarence Th[u]rman, and the portion of the Motion requesting additional psychiatric expertise is overruled.

¶37. Woodward now contends that his counsel at his re-sentencing hearing were ineffective because they failed to have Woodward re-examined by the staff at the state hospital at Whitfield. Woodward points out that during Michael Adelman's presentation of the subject motions, he argued that an evaluation of Woodward by a medical doctor, as well as by a psychiatrist, was essential to developing their case. During the hearing, the prosecution pointed out that Woodward had previously been examined by a medical doctor at the state hospital.

¶38. On September 24, 1986, the trial court entered its order that Woodward be transported to the state hospital at Whitfield for a psychiatric examination. The report from the state hospital was filed on February 6, 1987 and, in pertinent part, states

18

> It was the staff's unanimous opinion that [Woodward] is competent to stand trial at the present time and knew the difference between right and wrong in relation to his actions at the time of the crimes. We have seen no suggestion of psychotic disorder.

The report also states that records from Woodward's previous admission to the state hospital were also reviewed. That report was signed by a clinical psychologist and the staff neurologist for the state hospital. After being evaluated at the state hospital, Woodward moved for, and was granted, funds to hire private psychologist Dr. Clarence Thurman. Dr. Thurman conducted extensive evaluations of Woodward prior to his original trial and prior to his re-sentencing trial.

¶39.     Woodward's counsel at re-sentencing specifically requested that Woodward not be re-evaluated at the state hospital and instead requested funds to hire Dr. Ritter. The State argues that Woodward's counsel knew that the first evaluation from the state hospital was not favorable and any subsequent evaluation was also likely to be unfavorable. The State contends that this shows sound trial strategy and not ineffective assistance of counsel. This Court has held,

> Defense counsel's tactical decision not to investigate psychological evidence did not deprive defendant of effective assistance of counsel at sentencing phase of capital murder trial where defense counsel could have judged that psychological report would have been harmful. *Wiley v. State*, 517 So.2d 1373 (Miss.1987), *cert. denied,* 486 U.S. 1036, 108 S.Ct. 2024, 100 L.Ed.2d 610 *reh'g denied,* 487 U.S. 1246, 109 S.Ct. 6, 101 L.Ed.2d 957 (1988). Nothing in this report would support an argument that a reasonable attorney would present such damaging information to the jury or conduct further investigation into Foster's mental state.

*Foster v. State*, 687 So.2d at 1131-32. Adelman and Rushing made strategic choices regarding the mitigation case to be made. This does not show deficient performance, but sound trial strategy. Woodward has failed to "overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065.

19

Accordingly, Woodward has not shown that his trial counsels' performance was deficient, nor has he shown any prejudice. This issue is without merit.

### VII. Whether defense expert Dr. Clarence Thurman was ineffective.

¶40. Woodward argues that there were deficiencies in Dr. Thurman's evaluation of Woodward and in his testimony during the trial, to the extent that the requirements of *Ake v. Oklahoma*, 470 U.S. 68, 105 S.Ct. 1087, 87 L.Ed.2d 53 (1985), were not met. This Court has held that there is no constitutional right to effective assistance of an expert witness. *Brown v. State*, 798 So.2d 481, 499 (Miss. 2001), citing *Wilson v. Greene*, 155 F.3d 396, 401 (4th Cir. 1998). In *Wilson*, the United States Court of Appeals for the Fourth Circuit evaluated the requirements under *Ake v. Oklahoma* and held that the due process clause does not prescribe a malpractice standard for a psychiatrist's performance. *Id*. at 401. No independent constitutional right to effective assistance of a mental health expert has been recognized by the United States Supreme Court or this Court. This issue is without merit.

### VIII. Whether Defense Counsel erred in withdrawing their motion for change of venue.

¶41. Woodward's counsel during his first trial filed a Motion for Change of Venue on September 10, 1986. The trial court granted that motion, and Woodward's first trial was held in Hinds County. On April 27, 1994, during hearings on various motions, Woodward's counsel for his re-sentencing trial announced the withdrawal of the motion for change of venue. The following colloquy occurred,

> Adelman: Your Honor, the next motion is the motion for change of venue. Upon further reflection and consultation with my client, we are going to withdraw that motion. In fact I have a written ---
>
> Trial Court: Let me make absolutely certain, though, Mr. Woodward is aware of that.
>
> Woodward: Sir.

20

Trial Court:     Are you aware of that?

Woodward:       Yes, sir. I do wish my attorney to withdraw my motion.

Trial Court:     So you want it to actually be heard here in Perry County?

Woodward:       Yes, sir.

Adelman:        I am going to have him sign it, but it needs to be notarized.

That same day, Woodward's attorneys filed his Motion to Withdraw Motion for Change of Venue, which was signed by Woodward. The trial court's order granting the withdraw of the motion was entered on June 20, 1994. The case was originally set for jury trial on September 19, 1994, however, due to the disqualification of several jurors, the court was unable to seat a jury. During voir dire of the special venire, just prior to declaring the mistrial, the trial court again questioned Woodward's counsel regarding the withdrawal of the motion to change venue. The following colloquy occurred,

Trial Court:     Obviously I was going to grant a change of venue when that motion was filed, then the motion was withdrawn. I don't know if that was trial tactics or trial strategy or what, but I feel almost compelled to ask--

Mike, did you check with any outside sources or anything that made you determine that you could come here and get a fair trial in Perry County, since you had filed a motion at one time. And you may elect not to answer that. You may consider that as part of your trial strategy. . . .

Did you make the determination by yourself, or you and Ms. Rushing make it, or make it in consort with Mr. Woodward, or did you have some outside input of whether or not you could in fact get enough people here to try this case? . . . . And do you now want to call up your motion for a change of venue?

Adelman:        When I read the transcript I was convinced that Mr. Woodward stood as good, if not better, chance of getting a fair trial in Perry County than he did anyplace else. I read that transcript, I saw what happened in Jackson and I was convinced that --

21

Trial Court:    This is not a fair question and you can not answer if you want to. Are you still convinced of that?

Adelman:    Of course, as the defendant he has the right to stand trial in the county in which he is accused. My offer to Mr. White, and he knows what it is, is still good, and we could resolve this case.

. . . .

White:  Knowing that the defense cannot get a fair trial, in an effort to try and coerce a plea bargain, the State is not going to agree to plea bargain.

. . . .

Adelman:    First of all, let me say a couple of things.

I made the offer to you, Glenn, in good faith, whether you - I understand, and I'm not trying to coerce anybody. That's just an option and I want to make clear that it was open. And I understood your position from day one.

Number two, I, in good faith, looked at the options, and we were looking at the coast, and quite frankly, I do not believe that Mr. Woodward can get a fair trial on the [coast].

Woodward's counsel moved for a mistrial and stated that the defense "would like [an] opportunity to confer at some point, not necessarily today, about the possibility of an agreement on the change of venue." The trial court encouraged the motion to change venue to be refiled and the prosecutor stated that he thought it would be impossible to seat an impartial jury in Perry County. In granting the defense's motion for a mistrial, the trial court stated,

Oh, no, and I want this record to be replete with the fact that I'm certainly not questioning ineffective of counsel. [sic] I don't mean I don't think that you could have worked any harder on behalf of the defendant than you have done.

And I personally express the Court's appreciation both to you and Ms. Rushing.

But what I feared was going to happen did in fact happen. And I think that's just what you've got when you've got a county of this size.

22

The sentencing trial was ultimately reset for September 1995 in Perry County. During voir dire of the special venire, the prosecution requested

> that the court make a finding of fact concerning the competency and effectiveness of the attorneys for the defense counsel on their withdrawal of the motion for change of venue, especially in light of the quote, "fixed opinions" that we have had within Perry County, Mississippi on the death penalty issue as well as this particular case.

The prosecution requested that the trial court make a finding of fact that defense counsels' decision was tactical and not ineffective assistance of counsel. The trial court responded that he believed that defense counsel were extremely competent, with extensive experience in capital cases, and requested that Paul Woodward comment on the issue. Woodward stated,

> I have no problem with my attorneys. I regard both of them with a highest degree of respect. And as a matter of fact keeping the trial here was my decision and they are abiding by my wishes.

The trial court found that defense counsel were very competent, proficient and professional.

¶42. Woodward now contends that the withdrawal of the motion to change venue prevented him from having a fair and impartial jury and constituted ineffective assistance of counsel. Woodward asserts that his decision regarding the motion was based on erroneous information received from his attorneys, that his attorneys had told him if venue was changed, it would be changed to the coast, and that his attorneys did not discuss with him the possibility that venue might be changed to Adams County. Woodward also states that he would have agreed to have his case heard in Adams County.

¶43. Woodward's claim has failed to meet the requirements of *Strickland* to show ineffective assistance of counsel. The affidavits of Michael Adelman and Terryl Rushing show that their decision to withdraw the motion to change venue was sound trial strategy. In her affidavit, Terryl Rushing states that after the 1994 mistrial, they thought that it might be impossible to seat a jury in Perry County "and for this

23

reason the District Attorney would have to relent and forgo the prosecution of the death penalty. This was a strong reason for us keeping the trial in Perry County in 1995." In his affidavit, Michael Adelman states,

> However, we later decided to withdraw the transfer motion. We did this after full consultation with our client. I read the transcript from Paul's first trial and felt the Hinds County jury was very hostile toward Paul. I also did not want to go to the coast, because the victim was from Jackson County. It was my opinion that a Perry County jury could contain a number of white, blue collar men who would be able to relate to Paul and feel some sympathy for him.

> At Paul's 1994 sentencing a mistrial was declared because a jury could not be seated. The potential jurors were either against the death penalty or were too prejudiced against Paul. After further discussions with Mr. Woodward, we decided to keep the case in Perry County.

It also clear from the record that the suggestion of moving the trial to Natchez in Adams County was only briefly mentioned. Woodward was present in chambers during all discussions regarding possible options for moving the trial. In discussing those options, Adelman indicated that Natchez was one of a few places that they might consider moving the trial to. In response the trial judge pointed out that in order to change venue, the new location has to agree that the trial can be held there.

¶44. The defense's decision to withdraw the motion for change of venue was clearly a matter of trial strategy. The defendant and his counsel made an informed choice to withdraw the motion. Woodward has failed to show that his attorneys' performance was deficient. Woodward has also failed to show any prejudice to his defense. *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064. This issue is without merit.

## IX. Whether Defense Counsel failed to properly investigate the case.

¶45. Woodward argues that his trial counsel investigated the case themselves, instead of hiring a trained investigator. Woodward contends that his attorneys were not trained investigators and that their failure to seek funds to hire an investigator constituted ineffective assistance of counsel. Woodward argues that counsels' deficiencies denied him an important element of his defense team.

24

¶46. Woodward asserts that neither of his attorneys were "suited to the task of gathering all the necessary information in this case." However, Woodward does not state what information a trained investigator would have discovered that his counsel failed to discover. Woodward also does not indicate how the outcome of his trial would have been different, had a trained investigator been hired. This Court has consistently held,

> [a] defendant who alleges that trial counsel's failure to investigate constituted ineffectiveness must also state with particularity what the investigation would have revealed and specify how it would have altered the outcome of trial, *Nelson v. Hargett*, 989 F.2d 847 (5th Cir.1993), or "how such additional investigation would have significantly aided his cause at trial." *Merritt v. State*, 517 So.2d 517, 518 (Miss.1987).

*Cole v. State*, 666 So.2d 767, 776 (Miss. 1995). *See also* *Brown v. State*, 798 So.2d 481, 495 (Miss. 2001). Woodward has failed to show that his counsels' performance was deficient and he has no claim of actual prejudice. *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064. This issue is without merit.

## X. Whether Defense Counsel failed to admit medical records substantiating Woodward's claim that he was shot in the back of the head.

¶47. Woodward argues that his trial counsel were ineffective when they failed to admit Woodward's medical records regarding his gunshot wounds to his head. Woodward contends that the introduction of these records would have helped make him look more sympathetic to the jury and would have helped show his mental debilities.

¶48. Woodward's medical records from St. Dominic Hospital in 1979 show that he was shot in the back of the head. Those records also show that the bullet fragments were imbedded in his scalp, that they did not penetrate the skull, and that there was no bone damage. The records also state that Woodward was knocked down by the shots, but not knocked unconscious. After staying in the hospital for two days for observation, Woodward was discharged.

25

¶49. The defense elicited testimony from Woodward's father regarding this injury. The defense's theory regarding Woodward's mental debilities was presented to the jury through the testimony of expert and lay witnesses. The defense also focused on Woodward's mental illness during closing arguments. This Court finds that the admission of these medical records would have added nothing for the jury to consider and would have been cumulative. Woodward has failed to show that his counsels' performance was deficient and that any alleged deficiency caused him prejudice. *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064. This issue is without merit.

**XI.    Whether the Court erred in instructing the jury that it should not be influenced by sympathy.**

¶50. Woodward argues that the jury was instructed to disregard sympathy which was prejudicial and constitutes reversible error. Woodward is complaining about Sentencing Instruction No. C-1 and Sentencing Instruction No. S-4. Instruction C-1, which is more than two pages in length, states, in pertinent part,

> Members of the jury, you have heard all of the testimony and received the evidence introduced in the course of this trial. The Court will presently instruct you as to the rules of law which you will use and apply to this evidence in reaching your verdict.
>
> When you took your places in the jury box, you made an oath that you would follow and apply these rules of law to the evidence in reaching your verdict in this case. It is, therefore, your duty as jurors to follow the law which I shall now state to you. On the other hand, it is your exclusive province to determine the facts in this case and to consider and weigh the evidence for that purpose. The authority thus vested in you is not an arbitrary power, but must be exercised with sincere judgment, sound discretion, and in accordance with the rules of law stated to you by the Court.
> . . . .
>
> It is your duty to determine the facts and to determine them from the evidence produced in open court. You are to apply the law to the facts and in this way decide the case. You should not be influenced by bias, sympathy, or prejudice. Your verdict should be based on the evidence and not upon speculation, guesswork, or conjecture.

26

You are the sole judges of the facts in this case. Your exclusive province is to determine what weight and what credibility will be assigned the testimony and supporting evidence of each witness in this case. You are required and expected to use you [sic] good common sense and sound honest judgment in considering and weighing the testimony of each witness who has testified in this case.

Although you as jurors are the sole judges of the facts, you are duty bound to apply the law as stated in these instructions to the facts as you find them from the evidence before you. You are not to single out one instruction alone as stating the law, but you must consider these instructions as a whole.

. . . .

(emphasis added). Instruction S-4, which is more than four pages in length, in pertinent part, states,

The Defendant has been found guilty of the crime of capital murder. You must now decide whether the defendant will be sentenced to death, life imprisonment without eligibility for parole, or life imprisonment. In reaching your decision, you may objectively consider the detailed circumstances of the offense for which the defendant was convicted, and the character and record of the defendant himself. You should consider and weigh any aggravating and mitigating circumstances, as set forth later in this instructions, [sic] but you are cautioned not to be swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling.

. . . .

Next to return the death penalty, you must find that the mitigating circumstances -- those which tend to warrant the less severe penalty of life imprisonment -- do not outweigh the aggravating circumstances -- those which tend to warrant the death penalty.

. . . .

If one or more of the above aggravating circumstances is found to exist, beyond a reasonable doubt, then you must consider whether there are mitigating circumstance(s) which outweigh the aggravating circumstance(s). Consider the following elements of mitigation in determining whether the death penalty should not be imposed:

. . . .

If you find from the evidence that one or more of the preceding elements of mitigation exists, then you must consider whether it (or they) outweigh(s) or overcome(s) the aggravating circumstance(s) you previously found. In the event that you find that the mitigating circumstance(s) do not outweigh or overcome the aggravating circumstance(s), you may impose the death sentence. Should you find that the mitigating circumstance(s) outweigh or overcome the aggravating circumstance(s), you shall not impose the death sentence.

. . . .

27

(emphasis added). Woodward contends that the underlined language in both instructions told the jury to totally disregard sympathy. Woodward argues that the instructions were prejudicial to his case because a significant portion of his mitigation case was based on arousing sympathy for him from the jury. Woodward asserts that the instructions constitute reversible error and that his sentence should be reversed.

¶51.    The State correctly points out that Woodward failed to object to these instructions both during trial and on appeal. Accordingly, the consideration of this claim is barred by the provisions of Miss. Code Ann. § 99-39-21(1). Since Woodward has not shown actual prejudice, his failure constitutes a waiver and he is procedurally barred from raising this issue. *Wiley v. State*, 750 So.2d 1193, 1209 (Miss. 1999).

¶52.    Without waiving the procedural bar, the State correctly argues that the language at issue does not prevent the consideration, in toto, of sympathy. This Court has stated that

> the jury cannot be instructed to disregard sympathy altogether. *See Evans,* 725 So.2d at 691. However, they may be cautioned against being swayed by such considerations. *See id.*

*Wiley v. State*, 750 So.2d 1193, 1209 (Miss. 1999). In *California v. Brown*, 479 U.S. 538, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987), the U.S. Supreme Court evaluated an instruction that included the exact language Woodward complains about in instruction S-1. The U.S. Supreme Court held that, when the instruction was read as a whole, it is "no more than a catalog of the kind of factors that could improperly influence a juror's decision to vote for or against the death penalty." *Id.* at 543, 107 S.Ct. at 840. This Court has cited the *Brown* decision on this type of jury instruction numerous times. *Wiley v. State*, 750 So.2d at 1204; *Bell v. State*, 725 So.2d 836, 865 (Miss. 1998); *Holland v. State*, 705 So.2d 307, 352 (Miss. 1997); *Evans v. State*, 725 So.2d 613, 691 (Miss. 1997). In *Evans* and *Holland*, this Court evaluated the same language that Woodward complains about in instruction C-1 and found that the

28

instruction was proper under both state and federal case law. *Evans*, 725 So.2d at 690-91; *Holland*, 705 So.2d at 351-52.

¶53. "Having approved similar instructions in other cases, we find no error in granting the instruction[s] in question." *Holly v. State*, 716 So.2d 979, 986 (Miss. 1998)(citations omitted). This issue is procedurally barred and, alternatively, without merit.

## CONCLUSION

¶54. In his petitions for post-conviction relief, Woodward asserts that the re-sentencing trial was constitutionally and procedurally flawed, that his case should be reversed, and that his sentence of death should be vacated. Several of the issues raised by Woodward are procedurally barred, and all of the issues raised are without merit. Therefore, Woodward's pro se petition or post-conviction relief and his application for leave to file motion to vacate death sentence are denied.

¶55. **PETITIONS FOR POST-CONVICTION COLLATERAL RELIEF, DENIED.**

**PITTMAN, C.J., SMITH, P.J., WALLER, COBB, DIAZ, CARLSON AND GRAVES, JJ., CONCUR. McRAE, P.J., NOT PARTICIPATING.**